WILLIAM PHELPS, Appellant, *vs.* JOHN ROONEY, *et al.*

APPEAL FROM CIRCUIT COURT, MILWAUKEE COUNTY.

Heard June 10.]                    [Decided July 13, 1859.

*Homestead—Exemption—Married Women—Dwelling House.*

R. owned a building in the city of Milwaukee, four stories high, and leased the basement and first stories for the purposes of a store, at $1,500 a year, but resided with his wife and family in the upper stories; held that such a building was the dwelling house and homestead of R., and within the meaning of §§ 51 and 52, chap. 102, R. S., 1849; and being such, he could not alienate the same by mortgage, without the signature of his wife thereto; and that such a building so used and occupied was not subject to forced sale upon execution.

The word *homestead* as used in § 51, of chap. 102, R. S., 1849, means the land not exceeding the prescribed amount, upon which the dwelling house, residence, habitation or abode of the owner and his family is situated, without regard to the precise manner or style of the building thereon; and is restricted only by the amount of the land mentioned in the act, and not by the value or use thereof, if it be used for the dwelling house.

Phelps vs. Rooney.

The question whether a building is a dwelling house or homestead, does not depend upon the fact of its situation, external appearance, or internal arrangement, or that it would be vastly more valuable as a place of business than as a residence; but upon the fact that it is really and truly occupied as a dwelling house for the owner and his family; nor does, the owner forfeit the benefit of his exemption by devoting some, even the most valuable, portion of the building to another use than a mere residence of his family.

This was an action brought by the appellant against the respondents and others, in the circuit court of Milwaukee county, for the foreclosure of a mortgage given by John Rooney to William Phelps, on two parcels of ground, to wit: Lot 4 in sub-division of quarter blocks 21, 22, 23 and 24, &c.; and the south one-third of lot 4, in block 5, in the third ward of the city of Milwaukee, dated May 21st, 1856, to secure $3,300, and interest. The summons and complaint are in the usual form, and duly served. The complaint described the mortgage and the bond given with it minutely, with the manner of executing and recording the same, alledged default in payment according to the conditions of the same; that there was due the plaintiff $3,315 50, and interest from November 21st, 1856, at 7 per cent. per annum; that no proceeding had been had for the recovery of the same, or any part thereof, and demanded judgment, &c.

No appearance is made by any of the defendants, except John Rooney and Mary Rooney. They aver in their answer that Mary Rooney is the lawful wife of John Rooney, and has been so since a date several years prior to May, 1856, and did, at the date of the mortgage, and has ever since that time, and still does, live and cohabit with him as his wife; that the south 20 feet of lot 4, block 5, in the 3d ward of Milwaukee, and the building on it was, at the date of the execution of the mortgage, and for a long time before that time, had been owned by John Rooney, and occupied by him and his wife and family as a homestead, and has been ever since and still is so owned, used and occupied by them; and that it was at the date of the mortgage, ever since has been, and still is their only habitation, dwelling and homestead; that the mortgage was not executed by the wife, nor with her consent or approbation, but she expressly refused to execute the same, or in any way consent thereto; and they aver that the mortgage is not valid, so far as it relates to the south one-third of lot 4, block 5, and the buildings thereon, but is in violation of the

Phelps vs. Rooney.

statute and void. They also aver that Mary Rooney, not having signed the mortgage, has her dower in all the property described in the mortgage. And Mary Rooney specially and separately insists that no judgment should be rendered, depriving her of the homestead, or in any way affecting her right of dower in any of the premises.

The plaintiff's reply shows : 1st. That he has no knowledge or information sufficient to form a belief as to the marriage, &c., of John Rooney and Mary Rooney. 2d. Denies that the lot in the third ward was occupied by Rooney as a homestead at the time of the execution of the mortgage. 3d. That he has no knowledge or information sufficient to form a belief as to whether Mary Rooney refused to execute or consent to the execution of the mortgage. 4th. Denies that the mortgage was executed in violation of any statute, or is for any reason invalid. 5th. That the lot in the third ward is in the heart of the best business quarter of the city of Milwaukee, that it fronts on East Water street, which is the best and principal business street in the city, and on the Milwaukee river, and that there is not and was not any dwelling house on this lot at the date of the mortgage ; that the last named lot is not and never was a homestead, or occupied as such ; that the only building which was at the date of the mortgage, or has since been on this lot, is a brick store, four stories high, besides the basement, which fills the entire front on the street and extends back towards the river, so as to occupy, with its apurtenances, the whole surface of that fractional lot, and forms one of a whole compact body or block of stores, extending along East Water street, from street to street; that while he believes Rooney and family did occupy rooms in the upper part, the 2d and 3d stories, of the store, yet the principal part of the building and apurtenances, embracing the basement story, wharf in the rear, the principal story or store next above the basement, and the greater part of the upper lofts were not, at the date of the mortgage, occupied by Rooney, wife and family, for any purpose, nor by any body, as a dwelling or homestead, but was occupied by a tenant, who was a merchant, as a place of business, and held and used, not as a dwelling, but as a wholesale and retail store.

The plaintiff on the trial put in evidence the mortgage and bond, and rested his case.

The counsel for Rooney and wife called John Hickey as a

witness, who testified that he had known John Rooney and his wife for more than 14 years, that the Rooney store was built 6 or 7 years ago, and had been occupied, as to the basement and principal story, as a store, but that all the upper stories above the store had been occupied as a dwelling. One room, however, in the second story, over the store, was occupied as a store room for goods. The upper stories were built and finished off as a dwelling. Rooney has always, since he built it, lived there with his family, has occupied the same premises for the last ten years. I have often been in the house, and have slept there.

This lot is on the river side of East Water street; is twenty feet front and rear; that is the usual front of stores along there. The principal character of East Water street is that of a business street, and this store is situated in the midst of the best business part of that street. The whole block is built up compactly with a continuous block of stores with no spaces open. Part of Rooney's store is used as a dwelling. The others are all used as stores throughout. The style of architecture in front is that of a store. Upper stories not finished as a store. The principal story, except a stairway, is used as one long store room, is 150 feet long from front to rear, the basement is one long store room or cellar, except a little place partitioned off at the rear for a horse. As to the second story, that part originally built, was in May, 1856, and still is used as a dwelling, but afterwards the building was extended back to the river, and the west part of the second story was used as a store room for goods. Third story is all bed rooms. East Water street is the principal business street in Milwaukee, which is a city of 40,000 or 50,000 people. This property derives its chief value from being a store in the centre of business. In May, 1856, I slept in the second story, and I know it was used as a dwelling. Don't know who occupied the store. The clothing business was carried on there. Some other sign besides Rooney's was over the door. I did not know that Rooney had removed his stock. I knew he had goods in the second story. The store fills the whole front of the lot; and extends to the side-walk, there is no yard, and extends back nearly to the dock; the river at that point is navigable for vessels and steamers. There is a stairway in front.

It was proved that Mary was the wife of John Rooney, and had been so since a date earlier than the date of the mortgage by some years.

This witness was corroborated by others, and the plaintiff proved that the property derived its chief value from being a place of business, and not a residence. Building is in the usual style of a store and not of a dwelling. Principal floor occupied as a store, 20 feet wide by 150 feet deep; covers all the ground; a narrow, long room, in usual style of a store room. The store is worth four times as much rent as a store, as the upper part is for a dwelling. In May, 1856, store would rent for $1,500 or $1,600 per year; at same time most people would prefer a house which they could get for $250, to that part of this building which was used as a dwelling. This is in the midst of the best business quarter of the city, several blocks above and below are densely built up with three and four story business houses, generally of a permanent character.

The court found all the allegations of the complaint true, and gave judgment for plaintiff for amount demanded, and ordered the other lots sold to meet the same, but found that the building on the south one-third of lot 4, block 5, third ward, of Milwaukee, was a dwelling house, and was, at the date of the mortgage, owned and occupied by the mortgagor, with his wife and family, as a homestead; and as to that lot and building, the mortgage was void for want of the wife's signature. And thereupon the said mortgage was adjudged void by the court as to the part of the mortgaged premises last above named.

The plaintiff appeals from that part of the judgment which declares the mortgage void as to the premises last named, and from the refusal of the court to grant an order for sale of those premises, and from a refusal of a new trial on bill of exceptions.

*Waldo & Ody,* for Appellant.

1. This cause turns upon a single point, to-wit: Whether "the south one-third of Lot 4, in Block 5, in the Third Ward of the city of Milwaukee, with the building and appurtenances, known as store No. 107 East Water street," &c., under the evidence in the case, is *a homestead,* within the meaning of § § 51 and 52 of chapter 102 R. S. of 1849; and so beyond the power of the owner to mortgage " without the signature of the wife."

2. In seeking a proper construction of these sections, there are certain well established rules of interpretation to which we must adhere. The true and only office of interpretation

and construction is to ascertain the real intention of the legis-
lature, as expressed in the language of the act.   2 Cranch, 10,
358 ; 5 Term R. 449; 3 Cow. 89; 3 Scam. 153; 12 John.
176; 15 John. 358; 4 Cush. R. 314; 2 Pet. 662; 1 Peter's,
64; 21 Wend. 211.

This intention is to be first looked for in the language it-
self, taken in connection with the subject of the law, and for
this purpose the whole act should be taken into view.   *Raw-
son vs. The State,* 19 Conn. R. 292,   19 Vermont R. 131 ; 3
Kelly's R. 146 ; 21 Vt. 152; 3 Mo, 496 ; 25 Maine, 493; 12
Geo. 526; 2 Scam. R. 223.   And a construction must be
adopted that will give it a reasonable effect.   3 Mass. 523;
5 Mass. 380; 7 id. 458; 15 id. 205; 2 Pick. 571; 23 id. 93.
The words are to be taken in their ordinary and familiar sig-
nification and import.   Smith's Com. p. 661, § 513; 1 Kent
Com. 46; 1 Bl. Com. 60; 9 Cow. 506.

Whether we are to confine ourselves to a close or strict
construction of the words of the act, or to indulge a more
liberal rule of interpretation, will depend upon the nature and
subject of the act.   In general, all statutes which extend hu-
man liberty are to be liberally construed, but a statute which
in any way restrains it is to be strictly construed.   1 Bl.
Com. 88 (note); 12 John R. 273 ; 4 Shepley R. 255 ; Smith's
Commentaries, p. 621, § 468.   All statutes which are in dero-
gation of the common law, or which disturb or make innova-
tions upon established principles of law, are to be strictly con-
strued.   2 Mich. (Gibbs') R. 486; 16 John R, 7; 4 Binney,
116; 5 Denio, 119; 4 Mass. 471; 15 Mass. 205; 9 Pick. 496;
13 Pick. 284.   All acts exempting property from general tax-
ation are to be construed strictly.   The obligation to con-
tribute from one's property to the expenses of govern-
ment, rests upon a natural duty of every citizen who enters
society; and the exemption of particular property from this
burden, which should be uniform, is a dangerous innovation
which is strictly watched.   19 Ohio R. 110; *Perris vs. Wail,*
3 Welsby, Herlstend, & Gordon, 344; *George Earl &c., vs. Rec-
tor &c.,* 70 Eng. C. L. 804, 816–17; *Detroit Young Men's So-
ciety vs. City &c.,* 3 Gibbs, Mich. 182 ; 1 Met. 538 ; Black. on
Tax titles, 481, and cases cited in note; id. 708.

With equal strictness should acts be construed which ex-
empt property from the payment of just debts.   All such acts
are in the very nature of the case, in danger, unless most
strictly guarded, of relieving parties from natural duties of

primary obligation. Blackwell on Tax Titles, 698. All statutes which impose restrictions on trade or common occupations, must be construed strictly. 9 Pick. R., 412. Statutes which for any cause disable persons of full age and sound mind to make contracts, are to be construed strictly. It is a fundamental principle of human liberty, that a man may do what he will with his own; in other words, he may contract as he pleases. *Smith vs. Spooner*, 3 Pick., 229, 230. Statutes will not be interpreted so as to favor fraud, but so as to encourage right and justice. They "must be so construed as to suppress the mischief, advance the remedy, and preserve fundamental principles." Co. on Litt., 381, C.; 8 John. R., 41, 10 John R., 467 : Smith's Com., p. 660, § 512. And so that no innocent man be endamaged. 7 John R., 482, 495, 496. So, too, all retrospective laws are construed strictly. *Noscitur a Sociis,* is a maxim which will often aid us. Broom's Maxims, 450; 3 Term R., 87; Smith's Com., 655–8. The end or object which the legislature had in view will aid us in arriving at their intent. We must know the malady if we would understand the prescription for cure. The object of the action will reflect light on the intent of the actor. Smith's Com., p. 660, § 512; 3 Coke R., 7; 1 Pick., 248; 10 Pick., 235; 20 Pick., 267.

3. Look then at the words of the act : " *A homestead* shall not be subject to forced sale, &c. What is *a homestead* in the common, *ordinary, familiar signification* of that term ? Why, just what the dictionary says it is, and what we all familiarly understand it to be. It is *the place of the mansion house*; not the whole manor, but the inclosure or *ground immediately connected* with the mansion; not the whole farm or plantation, but strictly the place of residence of the proprietor; not the place of business, but the home of the family, the habitation, the abode. The very first words of the act, therefore, direct the mind to the real *intent* of the legislature. The land which *they* intend to exempt is *a homestead,* that is to say, the mansion house, or residence, with its immediate inclosure, the abode, the habitation, the family house. But, not content with this, it is further described as land with a " dwelling house and appurtenances" upon it. But still further, to leave no room for doubt, it is further limited to such a piece as is actually owned and occupied by the owner who would claim the exemption.

Again, *Noscitur a Sociis.* By § 54 it is provided that the

officer causing a survey to be made, must cause the piece to be " set off in a compact form, including the dwelling house and its appurtenances; and in § 56 of the same chapter, it is provided that " any person owning and occupying any *dwelling house* on land not his own, and claiming such house as his *homestead*, shall be entitled to the exemption of such house;" still holding up the idea of the *dwelling house* and *homestead* as the leading object to be preserved to the citizen. *People vs. Plumbstead*, 2 Gibbs, 465; *Rhodes et al. vs. McCormick*, 4 Iowa Rep., 386.

4. Again, what can be argued from the object or end which the legislature had in view? What is the true policy and end of the law? Can it be fairly said that the leading design of the act is to protect the citizen in the possession of a certain degree of wealth, or of means, however moderate; or to secure to every man within its purview a certain income or means of support for himself and family? If so, why confine its beneficent provisions *to those who own their homesteads*, and exclude that more numerous and weaker class who have not yet reached that position of independence? Why not have provided in direct terms for the preservation to every citizen, for the safety of himself and his family in adversity, of a parcel of ground of a certain value or of a certain extent, without reference to its being a homestead, or to its having a dwelling house and its appurtenances upon it, or to its being *occupied* by the owner? But further, outside of the words of the act, do we not know from the public and notorious history of the times, from the marked character of the discussions which agitated the popular mind and gave rise to this class of laws in modern legislation, from the language of the demand of the people as well as of the reply of the legislature, that it was not the quantity or value of the property, but the particular kind: not the means of living so much as the place to live; not a source of income, but a bare refuge, rather; not a field or a sea of enterprise, but a bare harbor in which to refit and prepare to go forth to new endeavors, that was then demanded on one hand and conceded on the other, demanded by the people, and finally conceded by the legislature? If we are right in this point, the only reason intimated by the learned judge of the circuit court for his decision, fails.

5. Once more. In that feature of the statute which is disclosed in the section on which this case immediately turns, § 52, it is a *disabling* act. It is plainly in derogation of the

common law making a serious innovation upon established principles, and abridging the liberty of human action; and upon account of all these characteristics is to be in this respect most strictly construed to preserve fundamental principles. No principle is more cardinal than this, that a man of full age and sound mind may dispose of his own property as he will. The right of disposal is as sacred as the right of property itself. This act disables a man from conveying or mortgaging his own house without a ceremony, which was never necessary at the common law.

6. Again, the courts will use the greatest strictness to prevent the act of the legislature, intended as a beneficial provision, being turned into an instrument of fraud. We have frequent exemplifications of this in the rulings of the courts under the statute of frauds. We urge the payment of debts as a duty of primary obligation; that the property of one who is loaded with past due debts, in equity belongs to the creditor; that in that case to exempt the property from this duty by law, is to take it by an act of sovereign power from him who is the equitable owner of it, and leave it with him who hath a bare possession without any just right. Such an act should be strictly construed. The location of the building in the midst of a continuous block of stores, of which it is one, the style of its architecture, its internal construction, the uses to which it is suited and for which it was used, its notorious name and reputation as a store and not as a dwelling, being described in the mortgage to the appellant as store No. 107 East Water street, the open and constant use of the principal part of it as a public place of business, and not as a dwelling, and above all, the fact that at the very time when the mortgage was obtained, and for a considerable period before and after that date, the whole of it, with only a slight exception, was actually occupied as a wholesale store by other parties, and not by the respondents, who insist on the exemption, preclude the idea that this building is such an one as was contemplated in the statute under the name of a dwelling house, or that these premises, as a whole, can within the meaning of the statute, with a rational construction, be denominated *a homestead.*

By the liberal construction which was adopted by the circuit court in the present case, this act, intended in mercy, will inevitably become a mere shield for fraud and injustice. Nay, it is not merely a liberal or loose construction, it is an abuse

of terms to say that a *store,* located, constructed and used as this was, is in any fair or rational, still less in any ordinary and familiar use of words, *occupied* by the owner *as a homestead.* Such an interpretation will render the homestead, intended as a refuge, a bare retreat in the vicissitudes of fortune, the castle of designing men, covering and preserving stolen riches against the assaults as well as importunities of the equitable owner. Such a design will not be presumed.

*Downer & Ladue, and Jenkins & Samuel Crawford,* for Respondent.

The defendants, John Rooney and wife, claim that the mortgage as to the land and building thereon, occupied by them as a homestead, is null and void.

This land was exempt from forced sale on execution, being a homestead, within the 51st section of chapter 102 of Revised Statutes of 1849. The proof is, that Rooney, his wife and family occupied the second and third stories of the building for some six years, and ever since the building was erected, and as his homestead; and that it was the only homestead and dwelling house by them used and occupied during all that time, and that it was so occupied when the mortgage was executed. There is no proof or pretence that it was not used and occupied as a homestead by Rooney *in good faith.* But it is insisted that because the first story of the building was occupied as a store, and occasionally the back part of the second story, and that on that account it cannot be claimed as a homestead. The language of the statute, however, is clear; and this court is called upon not to make laws, but to give construction to, and carry into effect laws passed by the legislature. It may be true that the exemption law is imperfect, and requires further legislation; but as it now is, this land and building are clearly exempt, both by the letter and spirit of the law, as a homestead, from forced sale on execution; and being so exempt, the 52 section of the same chapter, declares the mortgage void, because the wife did not join in, execute, or become a party to it. *Hoyt vs. Howe,* 3 Wis. 752.

The only case we have found even *apparently* conflicting with this view, is that of *Rhodes et al. vs. McCormick,* 4 Clarke, (Iowa) Rep. 369. In that case the majority of the court held under the exemption law of Iowa, that if under the same roof with the homestead, as defined by statute, there

Phelps vs. Rooney.

shall be a floor or floors, room or rooms, which are not used by the family as a home, that such rooms not used as a home, were not exempt from execution. The decision appears to be that the land on which the building stands, and all the rooms used as a homestead were exempt, but the rooms not used as a homestead were not. How those rooms not occupied as a homestead were to be sold, and how the purchaser could occupy them without acquiring an interest in the soil, the court does not inform us. Their statute, however, differs from ours, and it is clear that under our law the land itself is exempt; and if so, must carry the building as an incident with it. In fact, under the exemption law of Iowa, we think this is the better opinion, and the dissenting opinion of Judge Stockton, in the case above cited, maintaining that it is *the soil, the ground* that is exempt, and that if there is but one building thereon, *that and the whole of it* is exempt, although a part of it may be used as a store, we deem a well reasoned and the better opinion.

*By the Court*, COLE, J. The only question we have to consider in this case is, whether the south one-third of lot 4, in block 5, with the building and appurtenances thereon situated, and which premises are generally decribed in the evidence in this cause, as " store No. 107, East Water street," really constituted a homestead within the meaning and intent of § § 51 and 52 of chap. 102, R. S., 1849.

Those sections read as follows:

" § 51. A homestead consisting of any quantity of land not exceeding forty acres used for agricultural purposes, and the dwelling house thereon, and its appurtenances, to be selected by the owner thereof, and not included in any town plot, or city, or village; or instead thereof, at the option of the owner, a quantity of land not exceeding in amount one-fourth of an acre, being within a recorded town plot, or city, or village, and the dwelling house thereon, and its appurtenances, owned and occupied by any resident of the state, shall not be subject to forced sale on execution, or any other final process

Phelps vs. Rooney.

from a court, for any debt or liability contracted after the first day of January, in the year one thousand eight hundred and forty-nine."

"§ 52. Such exemption shall not affect any laborer's or mechanic's lien, or extend to any mortgage thereon, lawfully obtained; but such mortgage, or other alienation of such land by the owner thereof, if a married man, shall not be valid without the signature of the wife to the same."

The material facts of this case which present the questions involved, and call for a construction of the above provisions of our statute, may be briefly stated as follows: The respondent, Rooney, some six or seven years since, erected a building upon the portion of lot 4, first above mentioned, which is three stories high in front, and four stories on the river Milwaukee. The style of the building, externally, is that of a store, it is situated in a compact block, on one of the principal business streets of the city of Milwaukee. The basement of the building, and the first story, consisting of a room twenty feet front, by one hundred and fifty feet deep, have been leased by Rooney, and occupied by tenants under him, as a wholesale and retail store. But with the exception of one room in the second story above the main store, which was used as a room for storing goods, it appears that the second and third stories have been occupied since the house was built, and are still occupied by Rooney and his wife and family as a dwelling, and constitutes the only habitation or dwelling which they have. It further appears, that the property would be much more valuable on account of its situation for business than as a place of residence; and that the rooms leased for a store would command a rent of fifteen hundred dollars a year; while the rooms above, used for the purpose of a dwelling, would not rent for more than two hundred and fifty, or three hundred dollars a year. And although Rooney had leased the rooms used for a store, before the giving of the

mortgage, there is nothing in the case tending to show that he was not in possession of, and occupying the upper stories with his family, in entire good faith, as a dwelling house, when he executed the mortgage sought to be foreclosed. But the mortgage was not signed by the wife, and therefore the circuit court, considering that the premises constituted a homestead, within the meaning of the statute, held that the same was invalid, as to those premises, for want of the signature of the wife. The correctness of this ruling is the only matter, as before stated, we have to consider upon this appeal. A majority of this court concur in the view taken of the case by the circuit court, and are of the opinion that the appellant cannot hold the premises under the mortgage.

Upon an examination of the homestead exemption law, it will readily be seen that the latter clause of the fifty-first section, expressly declares that " a homestead, consisting of a quantity of land, not exceeding in amount one-fourth of an acre, being within a recorded town plot, or city, or village, and the dwelling thereon, and its appurtenances, owned and occupied by any resident of the state," should be exempt from forced sale on execution; while the fifty-second section clearly provides that every mortgage upon such land, given by a married man, shall be invalid, unless signed and executed likewise by his wife. This language of the statute appears to be plain and positive, and the intention of the legislature is manifest, to deprive the husband of the power, either by a confession of judgment, or by mortgage, of incumbering the homestead, or of alienating it in the latter manner without the consent and co-operation of the wife. That is, the law positively inhibits the husband without the concurrence of the wife, from giving a valid mortgage upon his homestead,which in a city may consist of a quantity of land not exceeding one-fourth of an acre, with the dwelling house thereon, owned and occupied by him, being a resident of the state.

Phelps vs. Rooney.

The language of the statute is so clear, precise, and unambiguous, that there can be but little difficulty in arriving at its real meaning. The counsel for the appellant in the very able argument which he addressed to the court upon this case, asked what was to be understood as a " homestead," in the ordinary familiar and popular sense of that word? I think I can substantially adopt the definition which he gave, and which I think the word must have, as used in this statute, that is, a homestead is the land in a city, not exceeding the prescribed amount, upon which is the " dwelling house," or " residence," or " habitation," or " abode" of the owner thereof and of his family. Evidently the statute does not contemplate that this "dwelling house," or " habitation," or " abode" thereon, shall be constructed in any particular style, or built in any prescribed manner. But it is to be in good faith, and truly the dwelling house, or residence, or abode of the owner and his family, in order to be exempt.

Whether this is a wise provision of law, and one which ought to be made, is not a question for the courts to determine. The policy of exempting a reasonable amount of property from sale, under an execution, underwent a very thorough discussion at an early day in this state, and it was declared in the 17th section of the Bill of Rights, that " the privilege of the debtor to enjoy the necessary comforts of life, shall be recognized by wholesome laws." In obedience to this duty enjoined upon it by the constitution, the legislature passed our present exemption law. Few candid persons would contend that this law was not defective, and that the grossest abuses do not find sanction under its provisions in many cases every day. Instead of securing to the debtor a reasonable amount of property, and a dwelling house for himself and family, of limited value, which shall be exempt from seizure, or sale, or even of placing it beyond the power of the debtor to alienate his dwelling without the

consent of the wife; we have a statute which exempts a homestead, consisting of forty acres of land, with the dwelling house and appurtenances thereon situated, and which may not be included in any town plot or village; or a quantity of land not exceeding in amount one-fourth of an acre, in a city or village, with the dwelling house thereon, and its appurtenances, and which exempted property, we all know may be, and frequently is, worth ten, twenty, thirty, or forty thousand dollars. And the whole policy of the legislation of the state has been to extend rather than restrict the privileges of the exemption laws.

The courts, whatever they may think of the general policy of this legislation, and whatever hardships may arise in particular cases in consequence of it, can only construe and interpret the statute as they find it. When the law is on its face sufficiently intelligible, and when a case clearly falls within the operations of its provisions, I feel it my duty rigidly to enforce it, whatever may be my notions of its policy or equity. So, in the present case, while it may be a hardship, that the respondent should enjoy, free from all compulsory power of the courts to subject it to the payment of his just debts, a property, (a homestead as I think it is,) a portion of which he can rent for twelve or fifteen hundred dollars a year; yet, if the statute exempts it, we must so declare.

It is insisted that the statute, when fairly construed, does not apply to a case like the one at bar. But it will not admit of doubt under the evidence, that Rooney occupied with his family the premises as a dwelling house. Neither will it be denied that the building is his " home," his " residence," his abode;" and the only " home," or "residence," or " abode," which he has. It appears he occupied the upper stories of the building with his family when the mortgage was executed in May, 1856. Can it then be said, that it is not his homestead, including the habitation or residence in which he

dwells; and the property which the law declares he shall not alienate by mortgage, without the consent of his wife? It is undeniable, that Rooney has occupied the building with his family as a dwelling, since its erection to the present time; and we therefore cannot see why, to all intents and purposes, it is not his homestead within the meaning of our statute. If Rooney had occupied the entire building with his family as a dwelling house, there could be no doubt, but the benefit of the exemption would apply.

The circumstance that the dwelling was situated on one of the principal business streets of the city, or the fact that its external appearance, or internal arrangement, was like a wholesale or retail store, or because it would be vastly more valuable as a place of business, than as a residence, could not affect the question. The case rests upon the fact as to whether the building was really and truly occupied as a dwelling house for himself and family; if so, they are secured in the enjoyment and use of it as such. This we think constitutes a homestead under the statute. Had Rooney seen fit not to use the first story at all, or had he converted it into a dining hall, or sleeping apartments for boarders, occupying, in the meantime, the remainder of the building for his dwelling house, it would probably not be insisted that his omission to use a part in the one case, or appropriating a portion to the comfort of his boarders in the other, changed the character and condition of the house and took it out of the operations of the statute.

But it is contended that by the clearest and strongest implication, the language of the statute excludes the idea that the building thus exempt from forced sale, or which cannot be mortgaged by the husband without the signature of the wife, is to be used and kept exclusively for a residence. The law, it is said, is analagous to statutes exempting certain species of property from taxation, like the cases in 19 Ohio, 110;

3 M. H. & Yerdon, 344; 17 E. C. L., 804; 70 id., 817; or that it is in derogation of the common law, and imposes restraints upon the rights of any married man to dispose of his property as he thinks proper, and should, according to well established rules of construction, be strictly construed, as was done in 2 Mich., (Gibbs,) 486.

After what has already been said as to the signification of the word homestead, as used in our statute, and the expression of our opinion that it included the limited amount of land in the city upon which is situated the dwelling house, or habitation, or abode, of the owner and his family, it is only necessary further to remark, that this court cannot restrain the operation of the statute within narrower limits than its words import.

Further, I have examined the case in 2 Mich. Rep., and think there is nothing in it that really conflicts with the principles laid down in the one under consideration. The property in that case was land used for agricultural purposes, and the court held that the debtor must select his homestead before the exemption attached. From Rooney's living in these premises, a single building, for six or seven years with his family, he has clearly shown that he had selected it for his homestead or residence.

Our attention was likewise called to the case of *Rhodes et al. vs. McCormick*, 4 Clarke R., (Iowa) 368, where the court of that state held, in a case much like the present in its facts and circumstances, that if a person should use a particular building as a home, the *whole* of such building, in case of controversy, would be presumed to constitute and be a part of the homestead, until it was shown that some specific portion was not used by the family, but for some other purpose; and when this fact was made to appear, the part not used by the family, would not be considered exempt. It is not my purpose to enter upon any extended examination of this case, I only observe, that I dissent entirely from the conclusion at

Phelps vs. Rooney.

which the court in that case arrived. And if I could concur in the reasoning and soundness of the decision there rendered, I should find insurmountable difficulty in applying the principle of that case to the one under review. I should rather come to the conclusion that a person, by neglecting to use and occupy a portion of his dwelling house, or residence, with his family, or by appropriating some portion to some other use, thereby forfeited and lost the benefit of the exemption law entirely; and it really seems to me, that this is the natural, legitimate result of the argument pressed upon us by the appellant's counsel. But I do not so understand the law of this state. I cannot believe, in view of the legislation upon this subject, that the legislature intended that a person should lose and forfeit the benefit of the homestead exemption, by omitting to use a portion of his dwelling house or residence, with his family, or by deserting such portion to some other use. It appears to me that this would be a most unauthorized interpretation of the acts and intent of the legislature of this state.

It was suggested that this view of the statute would lead to great mischief, and enable dishonest debtors to perpetrate gross frauds in holding, for instance, a large mill, or manufactory, or hotel, as a homestead, by occupying some small portion of them with his family. Extreme cases furnish a very unsatisfactory means of determining the true construction of a statute. We do not think the statute could be held to apply to such cases, and exempt them; but if it could, and the supposed consequences should follow from a fair construction of the law, the remedy would rest with the legislature and not with the courts.

It follows from the views expressed, that the judgment of the circuit court must be affirmed.

DIXON, C. J. *Dissenting.* The question involved in this case is of very great importance, not only to the parties in

interest, but as establishing the proper construction of the statute under consideration. It is one affecting the general interest of society as much, or more perhaps, than any other single question which could arise at this time; and disagreeing, as I do, entirely in the conclusions to which the majority of the court have arrived, I feel it my duty to state some of the reasons for my so doing. The facts in the case are stated as fully in the opinion of the court as I would desire, excepting in two or three particulars; but believing that the report of the case will contain a full statement of them, as well as the very able argument and points made by the appellant's counsel, I will not here attempt to supply them.

In my opinion the question is not so much one of doubt or ambiguity as to the general scope or purport of the statute, as one regarding the meaning to be attached to the word "homestead," and "dwelling house." These are words of very frequent and familiar use, and in ordinary language have, or ought to have, a fixed and definite meaning, which would convey nearly the same ideas to the mind of every person reading them, or hearing them spoken. For myself, I have no doubt that they have such meaning, and for the purpose of my argument, I shall assume that they have ; that being a proposition which I cannot discuss. Common sense will readily teach every man whether I am right or wrong in this assumption. Upon its correctness the truth or falsity of my conclusions will in a measure depend.

Whatever abstruse or technical rules may heretofore have been laid down and followed for the purpose of giving construction to statutes or other instruments; I understand that it has now become the settled and universal rule, sanctioned by the highest authority, that whenever words of a general nature occur in a statute, or other instrument, that they are to be understood according to their natural and obvious import, unless such meaning is clearly repugnant to the

intention of the framers, or would lead to great inconvenience or absurdity.

In *Jones vs. Harrison,* 6 Exch. R., 327, Parke B., says : " The rule which the courts have constantly acted on of late years, in construing acts of Parliament, or other instruments, is to take the words in their ordinary grammatical sense, unless such construction would be obviously repugnant to the intention of the framers of the instrument, or would lead to some other inconvenience or absurdity."

" The current of authority at the present day," says Bronson, J., in *Waller vs. Harris,* 20 Wend., 555, " is in favor of reading statutes according to the natural and most obvious import of the language, without resorting to subtle and forced constructions for the purpose of either limiting or extending their operation. Courts cannot correct what they may deem either excesses or omissions in legislation, nor relieve against the occasionally harsh operation of statutory provisions, without the danger of doing vastly more mischief than good."

" The fundamental reason of the rule," says Sedgwick," (Sedgwick on Statutory Law, page 261), " is that unless the courts, as a general thing, construe language in the same sense in which it was used by the legislature, that is, according to its ordinary and natural import ; it would be in vain to attempt to preserve any harmony between these two great co-ordinate branches of government ; and the contrary doctrine would open the door to intolerable looseness of construction."

It is for the purpose of applying these principles that I assume as the legislature did, and as every one must, that the words in question have a natural and generally accepted signification. Lexicographers agree in defining the word *home-stead,* primarily and naturally to mean, *the place of the house, the inclosure or ground immediately connected with the house*

Phelps vs. Rooney.

*or mansion*; not the house or dwelling itself, but the place of, or for it; the ground or land on which it stands, and which is directly connected with it. It is therefore necessary to the existence of a homestead that it should be a piece of land designed or used as the place of the house. Although the word is sometimes used in an enlarged sense so as to include both the house and the land, yet such I apprehend is not its usual signification, or that in which it was used by the legislature. That they used it in its primary sense appears plainly from their language, " a homestead *consisting* of any quantity of land," &c.

I am thus particular in endeavoring to ascertain the true and primary meaning of this word, because I think the the majority of the court, both in their reasoning and opinion in this case, have confounded this natural and obvious signification of the word with that of the words " abode," " dwelling house," " home," " residence," and the like, which do not necessarily mean the same thing. I can better illustrate by putting a case which is very likely to happen. Suppose the house of a debtor having a house and homestead, that is the quantity of land exempt by statute, should, by some accident, such as fire or storm, be destroyed, and the debtor and his family be thereby obliged to seek shelter and protection elsewhere, would the homestead be thereby subjected to seizure and sale, to satisfy the demand of some merciless creditor, whilst the unfortunate debtor was in good faith gathering the means and endeavoring to rebuild? I confess that in view of the benevolent spirit which actuated our exemption laws, and with my understanding of the word " homestead," I could never sanction such a proceeding and thus double his misfortunes. If, however, the word " homestead " means abode, residence, or house, he would lose it, for it would not then, by reason of his misfortune, be his abode, residence, or house. But if the word is construed in its ordi-

Phelps vs. Rooney.

nary sense, it might well be construed to be within the language of the statute; as it certainly would be within its spirit. Johnson gives an instance of the distinctive use and sense of the words "house" and "homestead," in the following lines from Dryden:

> "Both *house* and *homestead* into seas are borne,
> And rocks are from their own foundation torn."

In ordinary conversation, or in giving a construction to written instruments, I imagine that few people would disagree as to the meaning of the words "dwelling house," when used. If, when taken together, they have not a fixed and definite signification, then I know of no words in our language that have. Webster defines the two words taken together, as "the house in which a man lives." The word "house," he says appropriately, signifies "a building or edifice *for* the habitation of man; a dwelling place, mansion, or abode, *for* any of the human species;" that is, a building or edifice, or place, *designed or constructed* for the habitation of man, as distinguished from those other buildings, edifices, &c., constructed by man for other purposes. This I believe to be the ordinary and obvious import of the words, and to be the sense in which they were used by the legislature. It need not, it is true, be built of any particular materials, or in any particular style of architecture or workmanship, but it must be constructed and used for a dwelling for man, and not for other purposes.

The building in question is, by its location and external and internal construction, designed for a store, or place of business, and ever since its erection has been used by the defendant, and tenants holding under him principally for that purpose. It seems to me that the error lies in misinterpreting the words "dwelling house." It is assumed that they are synonymous with "habitation," "residence," "home," or "abode." A dwelling house may be either of these, but it

does not follow, therefore, that the words are convertible. The statute exempts a dwelling house, *eo nomine.* If the legislature had by name exempted every man's residence or habitation, there might be some propriety in extending the provision of the act to a case like the present; but even then I do not think it would be within its spirit. Man may take up his residence in any place which will afford him shelter or protection. Suppose a family were to reside in a steamboat (which very often happens), would that make the steamboat a dwelling house within the ordinary meaning of that word? It is true that the boat might not, owing to its being personal property, be exempt within the meaning of our statute, yet I think the illustration a fair one, for the purpose of showing the absurdity of calling every thing which may be used as a place of abode, a dwelling house. Yet such seems to be the reasoning of the court; and the same magical power of construction which can convert what is essentially a store, contructed, known, and used as such, into a dwelling house, in the ordinary or grammatical sense of the words, because some members of the human family happened to take up their abode therein, could, and if consistent, would be bound, under the same state of facts, to convert into dwelling houses churches, warehouses, depots, barns, mills, manufactories, boats, vessels, and every other structure or edifice, though still occupied for the purposes for which they were designed. Thus, what is to day a mill or factory, known and called such in ordinary language, would to-morrow become a dwelling house, upon some person making a residence of some remote nook or corner of it. When this loose rule of construction is once established, where is it to end? All the witnesses concur in saying that the building is *principally* designed and used as a store, and that its use as a residence is merely *incidental.*

Phelps vs. Rooney.

The proof shows that at the time of the execution of the mortgage in question, and long before and after, the main portion of the building was leased by Rooney to tenants, who occupied it as a wholesale and retail clothing store, at an annual rent of $1500, and that the annual value of the portion occupied as a residence was $250. Thus, it appears, not only that the building is by construction a store, but that *six-sevenths* of its value and use is devoted to that purpose. Now, if *one-seventh* of a building being used as a residence converts it *all* into a dwelling house, it is important that the court should define what lesser fraction would not. This is a calculation into which I confess my utter inability to enter; but as it is an important question, in which all the citizens of the state, and many out of it, have a deep interest, I insist that the court, which has adopted such a construction, should define, by some means, arithmetical or otherwise, just how far this system of transmutation may be carried. I mention this because it is intimated in the opinion of the court that a case might happen of a party occupying a part of a hotel or a mill, where they would not feel bound to consider it within the rule. It seems to me that such an intimation when compared with the principles established by the decision in this case is irrational, and that there can be no consistent limit except that fixed territorially by the statute.

The defendant's lot is 20 by 150 feet. He might own, on either side of him in the same block, two, and two-thirds more stores, and still be within the statute limit. He might also very conveniently occupy the whole of the third or fourth stories for the various purposes of a kitchen, bedrooms, parlors, &c. If such were the case, he would, at the same rate, be in the enjoyment of an annual income of $5,500. Would the court interfere in behalf of a creditor in such a case? If so, how and upon what principle?

I think it an utter perversion of language to call this

building a dwelling house. It is not, in any fair sense of the word. No one knows it as such; no one calls it such. A circumstance worthy of note here, and which appears from the case, is, that neither the defendant, nor any of the witnesses called to testify, not even those called by him to prove that it was his *dwelling house*, call it by that name. No one ever seems to have imagined that it was a dwelling house. It seems to have been left for the courts to make that discovery. The defendant, in his mortgage, called it " Store No. 107 East Water street," and every witness spoke of it in that way, or as " the Rooney Store." If the defendant had possessed a water power upon the premises, which he had improved by the erection of a mill or a factory, in some part of which he resided, the result must have been the same.

We are told in history that Diogones, the celebrated cynic philosopher, at one time took up his abode in a tub belonging to the temple of Cybele ; I suppose the tub became *ipso facto* a dwelling house in the ordinary sense of that word, and that hereafter strict propriety of language will require us to say that he lived in a dwelling house belonging to the temple instead of a tub. Nay, more, I suppose the moment the philosopher got into the tub, the whole temple instantly became a dwelling house, and that he might, had he been so inclined, have claimed it as exempt under the operation of a statute like ours.

If to-morrow a man in Madison should sell to another a lot in the city of Milwaukee, which the purchaser had never seen, and should represent to the purchaser that it had a dwelling house upon it, and should convey it as a house and lot, and the next day the purchaser should go to Milwaukee to see his property, I sincerely believe, if he had never heard of the decision in this case, that he would be surprised to find himself the owner of a lot with a shot tower upon it. If afterwards he should return to the seller

and complain of fraud and misrepresentation, I suppose the justification of the seller would be that the courts had decided that whatever building a man lives in, is a dwelling house; that at the time he sold, his family resided in the tower, and therefore the purchaser had got what he bargained for. I mention these things for no other purpose than to show what appears to me to be the absurdity of the meaning attached to the words dwelling house, and how totally variant it is from our common understanding of them.

A reason strongly urged for the construction given by the court, is that any other construction would operate harshly on a large class of small tradesmen, artizans, and shop-keepers in some of our large towns, such as seamstresses, shoemakers, and others of kindred occupations, who, it is said, are often times under the necessity, to a limited extent, of combining business and residence in the same building. My answer to this is, first, that if such would be the result, which I by no means admit, it furnishes no reason for the violation of well settled rules of statutory construction; and, secondly, that that question is not at all involved in this case. When a case arises where a residence is the *principal,* and business the *incidental* use of a building, I will be prepared to discuss that question; but I do not feel called upon now to do so. The design of the legislature was to give to the debtor a home, and not to create in his favor a source of revenue. In this respect, I think, the construction given is not only a violation of the letter, but of the spirit of the statute. By pursuing the obvious import of the language, every object intended would be attained with no substantial inconvenience. But by the coustruction given, the fraud and injustice which dishonest debtors will be enabled to practice upon their creditors, is beyond calculation. The door to them is opened beyond the power of the courts to remedy.

Phelps vs. Rooney.

It is suggested by the court, that the law is defective in allowing debtors to build large and expensive houses, and to hold them against their creditors.   How much is the evil remedied by the decision in this case ?   It is laid down as a rule in construing statutes, that courts are to presume that the legislature intends only what is just and equitable.   But here, because the law has some defects, (as what law has not?) it seems to be presumed that the legislature intended to perpetrate all the iniquity in their power.   If debtors have heretofore taken advantage of this defect in the statute, by building large and expensive houses, instead of devoting their means to the payment of honest debts, when it has been universally understood that they could use their houses for no other purposes than as residences for themselves, how much more will they do so now, when it is declared by this court, that they can make them a source of revenue by converting the greater portion into places of business to be occupied by others.   By this unjust construction, the evil is enhanced one hundred fold ,and that too, it seems to me, without the slightest shadow of sanction by any language used by the legislature.

In addition to the decision being contrary to public policy, and public justice in general, it is in direct violation of the rights of the plaintiff in, this case.   He advanced several thousand dollars on the security of this property.   It was described and in actual use as a store.   His own senses told him it was a store.   It does not appear whether he knew that the defendant's family lived in it or not.   That fact might have been concealed from him.   At all events, there was nothing to put him on inquiry.   If he had known it, however, and had sought advice, I very much doubt whether any one would have advised him that the signature of Mrs. Rooney was necessary to the validity of the mortgage.   The defendant intended and supposed he had given the plaintiff security.   The plaintiff believed he had it, and courts will not annihilate con-

Phelps vs. Rooney.

tracts and destroy the rights of parties except in clear cases. They will rather adopt such a construction as will promote the end of justice and equity.

Although I am in favor of a fair, I might say liberal construction of the statute in question, in aid of the intention of the legislature, yet as the 52d section, under which the defense in this action is made, is a disabling act, it should be, in this case, strictly construed. This rule of construction is well settled. In *Smith vs. Spooner*, 3 Pick. R., 230, Chief Justice Parker says: "Every man of full age and sound mind is at liberty to make contracts, and if made upon good consideration and without fraud, he must be bound by them, unless by statute provision, he is disabled. And disabling statutes of that nature should be strictly construed, for, though founded in policy and just regard to the public welfare, they are in derogation of private rights."

In *Short vs. Hubbard et al.,* 2 Bing., 349; 9 Com. Law R., 429, it was held that there was no impropriety in giving a strict construction to one clause and a liberal construction to another clause of the same statute.

In this view of the case, the question here presented is very different from what it would be were the plaintiff seeking to subject the property to the payment of his debt, by the ordinary process of law, against the will of Rooney, the owner, who, by executing the mortgage, has signified his wish and willingness to have it so appropriated. It was the exercise of a right on his part as the owner, with which no one could, by the common law, interfere. A liberal construction of this section may, at times, prove very inconvenient to some of these princely debtors, which it seems to be the design of the court to foster and protect.

Thus far, I think, upon principle, that the construction given is erroneous; that the legislature never intended it. My sense of justice to that branch of the government will never

Phelps vs. Rooney.

permit me to sanction it. So far as there are any authorities bearing directly upon the question, I think I am fully sustained in the views I have taken.

The case of *Rhodes et al. vs. McCormick*, 4 Iowa Rep., 358, which arose under a statute like our own, is like the one under consideration in almost every circumstance, except that there the plaintiffs were seeking to satisfy an execution against McCormick, by a sale of the premises. In that case the building was situated on a half lot in the city of Muscatine. The cellar and first story were rented by McCormick, and used as a store, whilst he occupied the second and third stories as a place of residence. The court held that the cellar and first story were liable to sale on the execution, whilst the debtor would remain the owner of the soil and the second and third stories.

In commenting upon the case, Wright, C. J., says: "A defendant cannot, by calling a house his homestead, make it such. He cannot, by occupying or using one room in a building containing forty, exempt the entire premises. Neither can he, by using all the rooms of the second and third stories, as a homestead, exempt from liability the store rooms that may be below, but which have no kind of connection with the homestead as such. * * * * While, as a general rule, it may be true, that the term 'house' includes an entire building, yet, within the meaning of this chapter, it is to be so construed as to carry out the object and purpose of the laws, so as to give the claimant his homestead, and not stores, shops and rooms, which are never used by the family, or for a home, or any part of it. In our opinion, it was never the intention of the law-making power to exempt from execution an entire building or house, for whatever used, because some portions of it was used by the owner as his homestead. * * * * The object of the law is to protect the home and preserve it for the family, and not

Phelps vs. Rooney.

shops, stores, rooms, hotels and office rooms, which are rented and occupied by other persons.    This construction attains the object of the code in exempting a homestead, and prevents the abuse of a law which was designed to discourage and not to encourage fraud."

Although I do not concur with the court in that case, that a building should be divided by horizontal lines, or by rooms, as the case might be, which might be productive of great mischief and inconvenience, being of the opinion that the converting of it principally to other purposes, ought to operate as a waiver of the right to claim it as exempt, I cannot but admire the strong sense of justice which pervaded the minds of the court.

In the case of the *People vs. Plumstead et al.*, 2 Gibbs Rep., (Mich.), 465, the court held that the owner of premises which had not previously been selected as a homestead, could convey them without the signature of his wife, notwithstanding the provisions of the statute are identical with our own, our statute having been copied from that of Michigan.    The decision was made upon the ground that no *selection of the owner* was proved, though the previous occupancy, as a homestead, was fully established.    In the present case no proof of selection by Rooney was made or offered.

These are the only authorities to be found having any direct bearing on the question.

I think the judgment should be reversed.