PHELPS vs. ROONEY and others.

APPEAL from the Circuit Court for *Milwaukee* County. This case was reported in 9 Wis., 70. On a motion for a rehearing, which was *denied*, DIXON, C. J. delivered the following dissenting opinion:

Per Dixon, C. J.   As I dissented from the judgment pro-
nounced in this case, so I dissent from the order denying
the appellant's motion for a rehearing.   I am unwilling that
anything should transpire, from which my assent to either
the judgment or order should be inferred, and having some
reasons which I am anxious to urge against both, I avail
myself of the opportunity thus afforded for that purpose. On
the former occasion (9 Wis., 87), I confined my remarks al-
most entirely to the *words* of the statute, endeavoring to show
therefrom that the construction given by the majority of the
court was false and erroneous.   At this time it will be my
principal purpose to endeavor briefly to show the same thing
by applying to the question under consideration, some of
those well settled rules and principles of statutory construc-
tion, which are so often resorted to by courts to aid in arriv-
ing at the true intention of the legislature, and which are
founded quite as much upon external facts and circumstan-
ces connected with the law as it stood before the passage of
the statutes, and of which courts take notice in considering
them, as upon the words of the statutes themselves.

The great object in construing statutes is, to ascertain what
was the true meaning and intention of those who framed
them; and although the words used may be said to be the
principal, yet they are not the only means of determining
such meaning and intention.   Of those rules derived from
surrounding facts and circumstances growing out of the pre-
vious state of the law, a primary and most important one is,
to consider the *mischief* intended to be remedied—the *defect*
for which the common law did not provide.   This rule in-
volves an inquiry into the law as it was at and before the
time when the statute was made.   By the common law, an
indigent debtor could be compelled, in satisfaction of his
debts, to part, not only with the necessary comforts, but with
the most meagre means for the support of life.   This rigor-
ous and unrelenting system for enforcing obligations, was
felt to be a great social and political evil.·   Beside the mis-
ery and suffering which it brought upon the debtor and his
family, it was often injurious to society at large, by rendering
them not only useless, but sometimes burdensome members

of it.  This was the mischief which had been the subject of complaint, and which the legislature, by the section of the statute under consideration, designed, in part, to remedy; it was the disease of the body politic which they resolved to cure.

Foremost among those things which were considered requisite to the comfort and happiness of the debtor and his family, and to the good order and welfare of society, though, owing to the slow growth of liberal ideas, not always the first to receive legislative care and attention, was a home—a suitable place of residence, with its appurtenances, in which he and they might remain, unmolested by the importunate and pinching demands of his creditors.  Accompanying this were the wearing apparel, household furniture, and necessary provisions for himself and his family, his library, the necessary domestic animals, teams, vehicles, and utensils of husbandry; and, to a limited amount, the tools and instruments of labor of the mechanic or artisan, the stock of the tradesman, and the library and implements of the professional man, all of which, together with other needful and proper articles, the legislature, by other sections of the act, has most wisely and beneficently provided for and protected.  Beyond depriving debtors of these, there was no complaint.  Aside from them, nobody had regarded it as a hardship that property of whatsoever character or description, should be taken and disposed of to satisfy debts which the owners had refused or neglected to pay.  Nobody had murmured because stores, warehouses, shops, mills, factories, and all other buildings and structures designed and used for trade, commerce or manufactures, and houses, lands and all articles of personal property, not enumerated in the above specifications, were liable to seizure and forced sale on execution.  The payment of debts has always been regarded as a duty of primary obligation, and its enforcement has been the principal object of almost all civil proceedings.  The general course of legislation has been to facilitate the means of collection, and advance the remedy, and not to impede or retard them.  The legislature did not intend to relieve debtors from the discharge of this duty, or to interfere with the general power to compel its performance.  But,

while a rigid and exact compliance with contracts and obli-
gations was esteemed a matter of general public good, to en-
force which it behooved the state to furnish its citizens with
adequate means and facilities, still, in view of the unfortu-
nate condition of many debtors, and the social and political
evils which it engendered, it was considered better for socie-
ty at large to withdraw from creditors so much of that coer-
cive power which had theretofore remained in their hands,
as was requisite to enable debtors, if they chose, by retaining
these necessary comforts, to ameliorate their condition and
relieve the public of an unwelcome burden. Individual
happiness and popular welfare demanded this much, but they
demanded no more. The legislature, if they went beyond
this, committed a positive wrong, which no man, however
blunted his moral faculties may be, if he has any, can fail
to perceive. If they went beyond this, they exceeded their
lawful powers, and disregarded that paramount obligation
which rests upon every state, to provide reasonable and
proper means, by which the rights of each individual may be
preserved and protected, and his wrongs relieved and re-
dressed. They overreached and violated the mandate of the
constitution itself, which declares, as a fundamental right,
that "every person is entitled to a certain remedy in the
laws, for all injuries or wrongs which he may receive in his
person, property, or character; he ought to obtain justice
freely, and without being obliged to purchase it, completely
and without denial, promptly and without delay, conforma-
bly to the laws." Sec. 9, Art. I. They overstepped both
the letter and spirit of its requirement, that "the privilege
of the debtor to enjoy the *necessary comforts of life*, shall be
recognized by *wholesome* laws, exempting a *reasonable* amount
of property from seizure or sale for the payment of any debt
or liability hereafter contracted."

I say that if the effect given to the act in this case be that
which the legislature intended it should have, *then* have the
legislature done or attempted to do all these things, and the
statute is to that extent unconstitutional and void, and ought
to be so declared by this court. For if the defendant in this
case can be thus permitted to withdraw from the reach of his

creditors so large and valuable a proportion of his property, which does *not* pertain to " the necessary comforts of life," then no man has " a certain remedy in the laws, for" any " injuries or wrongs which he he may receive in his person, property, or character." It is denied to the present plaintiff, and, if the same rule is to prevail, it must inevitably be denied to very many others. If the legislature can take away the remedy to this unjustifiable and alarming extent, they can destroy it entirely, and thus this solemn constitutional declaration of the people becomes a dead letter, a mere "glittering generality," without substance or effect. Under such a construction the statute becomes, in many cases, a plenary and positive denial of the latter clause of the same section of the constitution. It denies justice. It withholds it as freely, completely and promptly, as the constitution declares it shall be obtained. It is radically repugnant to the requirement of the constitution, that " the privilege of the debtor to enjoy the necessary comforts of life shall be recognized by wholesome laws, exempting a reasonable amount of property from seizure or sale:" 1st. Because it leaves unwilling debtors in the enjoyment of property which is *not of the necessary comforts of life.* 2d. Because it is *not a wholesome law.* And 3d. Because the amount of property which it exempts from seizure or sale is *not reasonable.*

A store or other place of business, is not one of " the necessary comforts of life." If it be, then are all things over which man exercises dominion and control, and the expression becomes unmeaning and idle. By it I understand those articles of property which all the inhabitants of a state or community must alike have and use, in order to the moderate enjoyment of life according to their age and sex, and the nature and custom of the country in which they live. Such are those which I have above enumerated, and which the legislature have, by their *language,* pointed out and exempted.

It is an unwholesome law. By enabling faithless debtors to withhold, of their abundance, that which justly belongs to their injured creditors, it breaks down and destroys the sanc-

tity of contracts and obligations, subverts and overthrows the principles of rectitude and integrity, and sanctions and encourages bad faith, fraud and dishonesty. The government that would enact such laws, would look with indifference upon robbery, theft and every kind of larceny or trespass. The one is a violation of private rights by stealth and force; the other, by deception and treachery; and no law can be wholesome which tolerates either.

The amount of property which it is thus made to exempt, is excessive and unreasonable. This objection is self-evident. It is noticed and admitted in the majority opinion of the court. They say "that the grossest abuses find sanction under its provisions, in many cases every day." It is broadly sustained by the facts of this case. Here property, of the clear value of $15,000, and the annual value of $1,500, not pertaining to the necessary comforts of life, not tools, or implements of physical or mental labor, nor articles of trade, and not that whereon or whereby the defendant must exercise his productive skill and industry for the present or future subsistence of himself and his family, is declared to be free from seizure or sale for the satisfaction of his debts. While owning this amount and kind of property, he is told that the payment of his debts and the fulfillment of his contracts with his fellow men is a mere matter of favor, which he may extend to or withhold from them at his pleasure, and that, in case of his refusal, there is no power in the law to compel him. The plaintiff is at the same time told that his remedy for the recovery of a just demand, little exceeding one-fifth part of the value of the property, rests in entreaty only, and that the laws afford him no redress for the defendant's noncompliance. And this is done by affirming a principle which would enable the defendant to hold property of the same kind to many times the same amount and value, without changing his legal position, or that of his creditors. Such a doctrine can never receive my sanction.

In my opinion such laws are prohibited by the foregoing provisions (section 9 and 17 of Article I) of the constitution. These two sections must be construed together, and so that both may stand and accomplish the objects intended. They

affirm certain fundamental principles by which the action of the government must ever be guided. They assert certain primary rights, which no legislature has the power to abrogate or destroy. By them we see that the attention of the framers was not directed exclusively to either debtors or creditors, as a class, but that they looked to, and guarded the rights and interests of both; and that they did not intend that the one should be legislated for at the expense of doing manifest and gross injustice to the other. Their language is as explicit and positive in the one case as in the other. The section which declares the privilege of the debtor, likewise declares the *extent* of that privilege, and the *kind* of laws by which it shall be recognized. This they were careful to do in order to prevent abuses, and that it might not be made a pretext for defeating the objects of the preceding section by withholding remedies, and disappointing the ends of justice. It is a well established rule of constitutional construction, that every affirmative prescription implies a negative of every thing contrary to, or inconsistent with it; and where the constitution prescribes that "the privilege of the debtor to enjoy *the necessary comforts of life*, shall be recognized by *wholesome laws*, exempting a *reasonable amount of property* from seizure or sale;" such positive directions, by necessary and unavoidable implication, deny to the legislature the power to protect the debtor in the enjoyment of those things which are not "of the necessary comforts of life," or to exempt from seizure or sale, an unreasonable amount of property, as clearly and strongly as if it had in each instance been forbidden by express words. The same may be said of the character of the laws by which the privilege of the debtor is to be recognized. They must not be unwholesome and evil in their nature and tendencies. They must not be a shield for dishonesty and fraud. This rule of construction is so obviously well founded in reason, and so familiar in practice, that it seems unnecessary to cite authorities in its support. If it were, the case of the *State ex rel. Crawford vs. Hastings, State Treasurer*, 10 Wis., 530, in which it was discussed and acted upon by this court, and the authorities there cited, are quite sufficient. When limitations

dinate to the people and to the constitution or government, has the power, by act, to defeat the objects for which it was erected, which were to establish justice, promote the general welfare, secure the blessings of liberty, and protect their persons and property from violence and injustice. The constitution, which is composed of the declaration of rights and the form of government established by it, is a compact made by the people among themselves, through the agency of a convention selected by them for that purpose. It is founded on the principle that, the people being the source of power, all government of right originates from them, and is subject to their control and such regulations as they have made by it. In construing it, therefore, we are to look to the purposes for which they entered into it, and be guided, as far as possible, by the motives which led to its formation. Those purposes being as well the foundation of the legislative as of every other power conferred, will not only enable us to decide what are the proper objects of those powers, but will also materially aid us in determining the nature and terms of the compact itself. The ends for which the legislative power was delegated will limit its exercise; and if an act be clearly hostile to them, and contrary to the principles upon which the compact is founded, it cannot be considered a rightful exercise of legislative authority, and will therefore be invalid. That the abolition of remedies and the shutting of the doors of justice against any man, or any class of men, are within the general purposes for which the constitution was formed, will not, I think, be for one moment contended, and it appears to me equally manifest that such authority is not to be gathered from any language used in the instrument itself. To say that that under consideration was used with such intention, is to contend that the people expressly authorized the legislature to frustrate and disappoint one of the principal objects of government, and the main one for which the section itself was introduced, and to leave them, at its pleasure, without the benefits which they intended to derive from it. It is making these words neutralize and counteract the effect of those which precede them, which were designed directly to restrain the legislature from exercising any such

June Term, 1860.

PHELPS
v.
ROONEY et al.

power, and rendering the entire section unmeaning and use-less. The words themselves show that there must be "laws," and the preceding clauses define what in substance and effect those "laws" shall be, and when they were once in force, no legislature could totally repeal them without the contemporaneous passage of others in their place.

It may also be said of section 17, that the legislature are the sole judges of its provisions and of the laws which are to be passed under it, and that it is for them to determine what are the necessary comforts of life, and whether the laws are salutary and healthful, and what is a reasonable amount of property to be exempted from seizure and sale for the payment of debts. But if it be admitted, as upon both principle and authority I think it must, that all positive prescriptions contained in constitutions, statutes and other instruments, imply a negative of everything inconsistent with them, then it seems to me clear that the power and duty of the courts, in proper cases, to construe and give effect to the section, and to see that the will of the people as expressed in it is carried out, and not infringed or defeated by the legislature, is as unquestionable as in any other case of legislative usurpation. For it would be useless for the people to give positive directions upon this or any other subject, and to prescribe the manner in which those directions are to be carried out, thereby limiting the legislative authority, if in any such instance the power of determining finally the extent and meaning of such directions, and the validity of their acts with reference to them, resided solely with the legislature. Such power would defeat and render nugatory all the restrictions and limitations on the authority of the legislature, and the people would be compelled either to submit to the usurpations or to assume the powers of government, whenever its ends were in any manner perverted. It was never intended, upon the passage of an act repugnant to, or in violation of, the constitution, that either course should be pursued—that the people should yield to a despotism, or reduce themselves to anarchy; but the design was, through the agency of the government itself, to provide proper modes for remedying such evils. Hence the separation of the gov-

ernment into distinct branches, and the judicious distribution of legislative, judicial and executive powers, in separate and distinct hands, subjecting the functionaries of each to such limitations and restraints as the people thought fit to pre-scribe, and obliging them, each in their respective sphere, to perform such duties as are severally assigned to them. Among the highest duties thus imposed upon the judicial branch, is that of determining the validity of all acts of the legislature, with reference to the constitution or fundamental law; and whenever by it the authority of the legislature is either expressly or impliedly limited, the courts cannot avoid the responsibility, in proper cases, of ascertaining and defining what those limits are. If, therefore, in attempting to exempt a certain quantity of land as the homestead, or place of the dwelling house and its appurtenances, or as agricultural land when the owner is a tiller of the soil, the legislature has declared that such land, and everything which the debt-or may attach to it, irrespective of its value or character, or the uses to which it may be put, or for which it may be de-signed, or who may occupy it, and irrespective of its connec-tion with those things which are requisite to the moderate enjoyment of life, or necessary to enable the owner, through the exercise of his trade or business, to gain a livelihood for himself and those who depend upon him, shall, under all circumstances, be exempt, such act as clearly exceeds the authority given by the constitution, as if the legislature had gone outside its requirements by express words, and, naming such property, had said that it should not be subject to seiz-ure or sale; and it would be alike the duty of the courts in either case to declare the act to that extent void. And if, in so doing, the legislature has enacted an unwholesome law, and has suspended the remedy of the creditor, when the people intended he should have one, and has authorized the debtor to retain, of such property, an amount or value which is excessive, these are violations of the constitution in other respects, and furnish additional causes for adjudging the act invalid. In such cases the manner of the attempted en-croachment is immaterial. It is the substance and effect, and not the form of the act, to which the courts are to look.

If it had been made to read that property of this character, to the amount or value of $15,000, should not be liable to seizure or sale, the violation might have been more obvious, but it would have been no more substantial or complete. If the legislature, after having, as it has already done, by the most liberal provisions, secured to the debtor a home and the other comforts of life, and the necessary means with which, by the practice of ordinary industry, to earn them for the future, had said that in addition thereto, he should be entitled to claim and hold as exempt $15,000 of other property, I do not see how it could be well maintained that such act was not plainly hostile to the spirit and requirements of the constitution. It is equally so now, under the interpretation which it has received. It is said, in the opinion of the majority of the court in this case, that, under the provisions of the act, property of the *kind* contemplated by the constitution, of many times the value of that under consideration, is frequently claimed and held as exempt. If this be so—and there can be little doubt of it—it is no argument to prove that the legislature may exempt that which the constitution excludes. Besides, its limitations, as I have shown, do not extend to the kind of property merely, but they include its amount and value, and both are to be regarded. And it is no answer to an objection as to the *kind* which is exempted, to say that the legislature have, by the same act, exceeded their powers as to its *value*, were it such as it might lawfully protect. Both limitations are equally binding, and an excess of either avoids the act. According to the principles for which I contend, and which are so old and well established that they have become axioms of our law, the courts must determine the extent of the legislative authority under both; and unless they do, they ignore and cut off the authority of those principles, and leave the people subject to greater calamities than an unwise or injudicious application of them would be likely to produce. The task may be a most difficult and delicate one, and require the greatest care and reflection in its performance, but it is no invasion of the province of the legislature and no arbitrary and unphilosophical extension of principles beyond the field of their legitimate application.

There may be some matters which, from necessity, are, under the constitution, left to the discretion of the legislature, and of which they are the sole judges.   The exigencies of society in some instances require the investment of such extraordinary powers, but the subjects under consideration do not fall within them.   They are expressly taken out.   Where such powers are delegated, it undoubtedly rests in the wisdom of the legislature to determine when and how they shall be exercised, and the courts cannot interfere.   For a discussion of the doctrine of implied limitations as applicable to statutes, I would refer to the case of *State ex rel. Gill vs. Common Council, &c.*, 9 Wis., page 254.

June Term, 1860.

PHELPS
v.
ROONBY et al.

From this two-fold or connected view of the mischiefs to be remedied, and the provisions of the constitution which concern them, the true intention of the legislature, I think, becomes more apparent.   We thus see, side by side, not only the evils themselves, and the views which the people took of them, but also the nature and extent of the remedy which they intended to provide.   It brings to our assistance another rule or maxim of statutory construction, which it is always of the first importance to observe, and which is, that we are never to presume that the legislature would intentionally infringe the provisions of the constitution, or violate the rights of the citizen.   Such presumption is only to be overcome by the plain and manifest language of the act; and if the language be susceptible of a construction which is consistent with it, the act must stand; but if not, then it must fall. Where usurpations do take place they are not presumed to occur with deliberation, but are considered as the results of mistake or inattention, or of the dominion of the passions over reason, in times of political struggle.   Starting then with this presumption, it is the first object of the courts to reconcile the acts of the legislative body to it, and, failing in this, they are to declare them void.   Applying this rule to the facts of this case, and the true construction of the act becomes very evident.   By the constitution the legislature had no power to exempt stores or other places, purely or principally devoted to trade or business.   By the act they have not said that such property should be exempt; but, on the contrary, their

language indicates that which is entirely different; and hence an intention to exempt it cannot be inferred, nor can such effect be given to the act.

Having thus, from the previous condition of the law, and the language of the constitution, learned the evils complained of, and the intended mode of redress, we are made acquainted with the true reason of the remedy, or, what is the same thing, of the law itself. We are possessed of the ideas in which it originated, and by which its language was dictated. And unless, from some unknown cause, its language be clearly repugnant thereto, we are to so construe it that its results will conform to those ideas. We are to enter into, and be governed by, its spirit and reason, and the motives of those who enacted it. But as it is not contended by any one that there is anything in the language itself which conflicts with the general objects of the act as I have stated them, I need not dwell longer here.

This brings me to another rule, the consideration of which has led me seriously to doubt the correctness of one position which I took on the former occasion, which was, that the construction of the principal part of the building in question for a place of business, and the appropriation of the same as such by the debtor to the use of others, operated as a waiver or forfeiture of his right to claim any portion as his homestead. The rule to which I refer is, that we are to give such construction as shall suppress the mischief and advance the remedy, and avoid inventions and evasions for the continuance of the mischief, and give force and life to the cure and remedy. *Heydon's case*, 3 Co. Rep., 7. Upon further reflection on the facts of the case in connection with this rule, I am satisfied that I was in error, and that the law as laid down in *Rhodes et al. vs. McCormick*, 4 Iowa, 368, is correct. It will be remembered that the building was erected some years before the indebtedness to the plaintiff accrued, and that *Rooney's* occupancy of that portion used as a dwelling house, dated back to the time of its completion. So far as that portion is concerned, no change in its use or occupancy has occurred from that time to the present. His possession was not fraudulent in its inception. No element of dishonesty entered

into the manner in which he took it. His purposes originally were fair and upright, and, until the contrary be shown, cannot be presumed otherwise. I know of no sound principle upon which his mere continuance in the occupation as a dwelling house of that part designated and constructed as such, can be said to operate as a waiver or forfeiture of his right to claim it as exempt. Nor do I see how his possession can be said to have become fraudulent or dishonest. His subsequent embarrassments certainly cannot have such effect, for to give it to them would be to let in inventions and evasions for the continuance of the mischief, and to destroy the force and life of the cure and remedy at the very time when he most needed them, and when they were designed to operate most effectually in his favor. This would be to advance the mischief and suppress the remedy; it would make the presence of the disease a pretext for withdrawing the cure. I am, therefore, of opinion that that portion which was constructed and used as a dwelling house, was within the operation of the exemption law, and that no interest in it passed by virtue of the mortgage in question. But as to the residue of the building, which was separate and distinct from the dwelling, I think the mortgage was valid and passed the defendant *Rooney's* title and interest. Upon this branch of the inquiry, beside the case of *Rhodes vs. Mc Cormick*, I wish to refer to some other authorities. It is well settled at common law, that houses and other buildings may be divided by horizontal as well as perpendicular lines, and that one person may be the owner in fee of the upper or other story, and another person of the residue of the building. *Loring vs. Bacon*, 4 Mass., 575, and *Cheesborough vs. Green*, 10 Conn., 318, and other cases there cited, are direct to this point. The first was a case where one party was seized in fee simple of a room on the lower floor of a dwelling house and of a cellar under it, and the other seized in fee of a chamber over it, and of the remainder of the house. Each was considered as the owner of a distinct dwelling house, the one over that of the other. Their relation to each other is thus defined by Chief Justice Parsons, who delivered the opinion of the court: "Although in this case

the parties consider themselves as severally seized of differ-
ent parts of one dwelling house, yet in legal contemplation
each of the parties has a distinct dwelling house adjoining
together, the one being situated over the other. The
lower room and the cellar are the dwelling house of the
defendant; the chamber, roof, and other parts of the edifice,
are the plaintiff's dwelling house." In the last case the
plaintiff owned the foundation and first and second stories
of a building, and the defendant the third story and roof of
the same building. It seems clear, therefore, that it would
have been competent for *Rooney*, had he been so disposed,
to have conveyed absolutely, or by way of mortgage, the
basement and first story of the building, reserving the upper
stories, or those portions which were occupied as a dwelling
house, of which he would have remained the owner in fee.
If he could have done so by deed, it seems equally clear
that the same thing can be accomplished by act and opera-
tion of law. Having never occupied the basement and low-
er story as a dwelling house, they were open to seizure and
sale for the payment of his debts, leaving him in the undis-
turbed possession and use of the portion actually occupied
for that purpose. Or, the basement and lower story having
been so occupied, a subsequent voluntary abandonment of
such use and occupation would at once render them liable
to such seizure and sale, and consequently to alienation
without the signature of *Mrs. Rooney*. The restriction of
the husband's right to convey without the signature of his
wife, is confined to the dwelling house *owned and occupied as
such*, and the land upon which the same is situated. The
law regards only that part of the building thus occupied, as
the dwelling house, and looks upon it as *distinct* from the
residue, as if it were separated by perpendicular walls.
Hence, I am of the opinion that the mortgage was good
as to the basement and first story of the building, and that
it should be so far enforced.

A very strong, and to my mind conclusive argument
against the position of the majority of the court, that the oc-
cupation by the debtor of any portion, however small, of a
building as a place of residence, makes the whole building a

dwelling house, within the language and meaning of the statute, regardless of its structure, or the use to which the residue may be put, is to be derived from the principles of law applicable to controversies between landlord and tenant, as to the right of the tenant to remove buildings or fixtures erected by him during his term. Fixtures erected to carry on trade and manufactures, are, by the common law, removable by the tenant during his term; but fixtures erected for other purposes are not. Cases have occurred where they were erected for the double purpose of trade or manufacture, and as places of residence, and questions arisen as to the tenant's right to remove them under such circumstances. The turning point in such cases is said to be the purpose for which the building was chiefly designed and used. If it was *principally* to carry on trade or manufactures, and its occupancy as a dwelling but *incidental* to this main purpose, then the tenant has the right to remove it. If, on the other hand, the primary object was a dwelling house, and trade or manufactures the incidental use to which it was put, he has no such right. *Van Ness vs. Pacard*, 2 Peters, 137, was such a case, and it was determined upon these principles. It seems to me that they have a strong bearing upon the case under consideration, and that if they are correct for the purpose of determining the nature of the fixture, or kind of building, in the case of a tenant, they must also be correct and applicable to a case like this; and that consistency of reasoning would require the court, if *Rooney* had been a tenant, and had erected and occupied the building in precisely the same way, to overturn these much favored principles of the common law, and to hold that as between him and his landlord, he had no right of removal, because the building was a dwelling house, and not a fixture erected for the purpose of trade.

In my opinion the motion for a rehearing should be granted.

# AN INDEX

## TO THE PRINCIPAL MATTERS

### CONTAINED IN THIS VOLUME.

————◆●◆————

## A.

### ABATEMENT.

The objection that one of the grand jurors who found an indictment, was an alien, cannot be taken advantage of after a plea to the merits, although the disqualification was not known to the defendant until after such plea was filed. *Byrne et al. v. The State,*　519

### ACCESSARY.

See CRIMINAL LAW, 13.

### ACCOUNT.

See PAYMENT, 1.

1. Plaintiffs sent to defendant a statement of their account, containing sundry charges, giving defendant credit for sundry payments, and showing a balance due the plaintiffs of about $400: *Held,* that the plaintiffs were not bound, in bringing suit, to declare for the balance of the general account so exhibited, but might select a single item in their account not larger in amount than such balance, and sue therefor; especially as it appeared that the item selected was the only one in the whole account, about which there was any dispute between the parties. *Ranney et al. v. Higby,*　61

2. Where an action has been brought for part of the items of a running account, omitting other items of the *same* account which were due at the time, and judgment has been recovered therefor, such judgment is a bar to another action afterwards brought to recover for the items so omitted. *Borngesser v. Harrison,*　544

3. Where the court instructed the jury, that the judgment in such former action for part of an account was a bar to a subsequent action for the residue, and that "the whole account being between the same parties and for furnishing the same articles, all being due at the time the first suit was brought, a recovery for a part is a bar to a recovery for the other part:" *Held,* that the instruction fairly implies that the jury must find that the account sued for in the second action was part of the same account which was the subject of the first action, before they could find that it was barred by the judgment; and that if the plaintiff desired to present to the jury more definitely, the question whether there were *two* accounts between the parties, he should have asked a specific instruction upon that point. *Ibid.*

4. There may be two or more running accounts in favor of one party against another, which might be the subject of separate suits, but the balance due to a party on account ordinarily constitutes but one demand, where there is nothing in the course or nature of the dealings, or in the mode in which the accounts are kept, to indicate a different intention of the parties. *Ibid.*

### ACTION.

See PLEADINGS, 5.

1. By an act of the legislature, which took effect in April, 1855, it was enacted that, "All railroad corporations within this state shall be responsible and obligated in law to the laborers on the line or lines of railroads being constructed by said corporations, and are responsible and liable to pay for all labor performed by said laborers, severally, upon said road or roads, to the persons performing such labor * * * and for the purposes of this act, all the usual remedies by action are given to any and all such laborers against any such corporation. * * * No suit shall be maintained under the provisions of this act, until such laborer shall have given thirty days notice in writing to the president or secretary of such company, that wages are due him, and that the company is required to make payment for such wages so due, stating the amount claimed." This act was *repealed* by an act which took

effect in March, 1857, and which enacted that, "Whenever any laborer upon any railroad in this state shall have just claim or demand to the amount of twenty dollars or more for labor performed on such railroad, against any person being contractor on such railroad with the railroad company for the construction of any part of the railroad of said company, such railroad company shall be liable to pay such laborer the amount of such claim, provided such laborer shall have given notice to such railroad company, within thirty days after such claim or demand shall have accrued, that he has such claim or demand, and provided also, such claim or demand shall have accrued within sixty days prior to the giving of such notice," &c.: *Held*, that a person who performed labor for a sub-contractor, upon one of said railroads, in the summer and fall of the year 1856, and in October of that year gave notice of his claim to such railroad company, as required by the act of 1855, acquired a vested right to recover from such company the wages of such labor, which the act of 1857 could not divest, and an action against the company, for such wages, though not commenced until after the act of 1857 took effect, could be maintained. COLE, J., *dissenting*. *Streubel v. Mil. & Miss. R. R. Co.*, 67

2. A mortgagee of personal property may maintain replevin against a person taking the same in defiance of his right, although he was not in actual possession of the property, if, by the terms of the mortgage, he was entitled to take possession whenever he deemed that the safety of the debt required it. *Welch v. Sackett et al.*, 243

3. The assignee of a note, which was overdue and had been paid, cannot maintain an action upon it against the maker, although he took the assignment without notice of such payment. *Dunbar v. Harnesberger*, 373

4. The mortgagor of personal property may maintain an action against the mortgagee (who has sold the same under a power of sale in the mortgage), for the surplus which remains after the debt and all reasonable costs and expenses are paid. *Flanders v. Thomas*, 410

5. An action does not lie against the state for services of attorneys employed by the school land commissioners, to defend suits brought against them in their official character in the supreme court. *Orton et al. v. The State*, 509

6. Where an action has been brought for part of the items of a running account (omitting other items of the *same* account, which were due at the time), and judgment has been recovered therefor, another action will not lie to recover for the items so omitted. *Borngesser v. Harrison*, 544

7. No action can be maintained upon a claim which has been allowed by the county judge, or by the commissioners appointed by him to examine and adjust claims against the estate of the deceased, in accordance with the statute, unless, after an order of distribution has been made by the county judge, the administrator refuses or neglects to pay according to the order, in which case he becomes personally liable. *Price v. Dietrich*, 626

8. Where a complaint averred that the written promise sued upon had been assigned by the promisee to the plaintiff, who thenceforth continued "to hold, own and possess the same for the benefit of" a certain bank, and was entitled to the sum due "for the benefit of" said bank, it was *held*, on demurrer, that the plaintiff was entitled to maintain the action in his own name, as a trustee of an express trust. *Kimball v. Spicer*, 668

9. The owner of a mortgage upon real estate, who has obtained a judgment of foreclosure and sale, may maintain an action for an injury done to the premises before the sale, which impaired the security and prevented the full amount of the debt from being realized, the mortgagor being insolvent, and the act having been committed wrongfully and fraudulently, with intent to injure the owner of the mortgage. *Jones v. Costigan et al.*, 677

10. Where such injury is committed by the mortgagor, or others acting by his direction, knowing his insolvency, and the existence of the security, and that the act complained of will *impair it*, the action should be sustained. *Ibid.*

11. Where the owner of a mortgage has assigned it for the benefit of his creditors, the assignee is the proper plaintiff in an action for such an injury done after the assignment. *Ibid.*

ADMINISTRATORS AND EXECUTORS.

Where an administrator does not render an account of his administration to the probate court within one year from his appointment nor apply to the court to extend the time for doing so, the court may cite him to render such account upon its own motion, and without the application of any one interested in the estate. *In re Campbell*, 369

ADMISSIONS.

See EVIDENCE, 10.

AGREEMENT.

See CONTRACTS.

ALIENAGE.

See ABATEMENT.

June Term,
1860.

PHELPS
v.
ROONEY et al.

upon the law-making authority, whether they be expressed or implied, are general in their character, the safest and wisest rule, undoubtedly, is for the courts not to interfere, if the alleged infringement fairly admits of doubt or controversy; but when, as in the present instance, the violation is bold and palpable, their duty to do so is plain and obvious.

It is possible to say of section 9, that its concluding words, "conformably to the laws," give to the legislature a discretionary power to provide such remedies and prescribe such forms and modes of proceeding to obtain justice as it pleases; and that under them, it may, at its option, without supplying others, abolish all remedies, and annul all the means by which rights are to be ascertained and justice administered.

It seems obvious to me that such was not the meaning which the people intended should be attached to these words; and unless it is, and there is thereby expressly granted to the legislature, an unlimited power to deal with remedies and the course of justice as it pleases, I am not among those who can subscribe to its omnipotence, or yield that it is absolute and without control with regard to either. The framers, after having by the preceding portions of the section fully expressed the leading objects of it, evidently introduced these words as a constitutional affirmation that every person must seek his remedy and obtain justice in conformity with, or agreeably to, "the laws" which must be enacted for those purposes. The nature and qualities of those laws are fully prescribed. They must be such as will afford every person a certain remedy in them for all wrongs or injuries which he may receive in person, property, or character; and such that by them he may obtain justice freely and without being obliged to purchase it, completely and without denial, promptly and without delay. After having, so far as the laws were concerned, secured to each individual such a remedy and such a measure of justice, they bound him to seek them pursuant to those laws, and in effect said, he must do so "conformably to" them, and in no other way. These words, then, instead of operating as an extension of the powers of the legislature, are in reality a restriction of the natural rights of the citizen. Laws complying with the require-

ments of the section must, therefore, be passed, and in pursuance of them, wrongs must be redressed and justice administered. It may be that there are some omissions of duties imposed by the constitution, against which it was impossible for the people completely to guard, and for which they could provide no direct or immediate remedy; but such was never the case, so far as it concerned the obligations created by the section under consideration. The people themselves executed the duties enjoined by it at the time they ratified the constitution. When the constitution was adopted, and when under it the people were about to pass from the condition of a territory to that of an independent state, they were in the enjoyment of a code of laws, by virtue of which remedies were afforded and justice was administered in as full and ample a manner as this section requires; and those laws they cautiously preserved in full force until they should be repealed and others enacted in their place. The second section of Article XIV, called the "schedule," provided that all laws then in force in the territory of Wisconsin, which were not repugnant to the constitution, should remain in force until they expired by their own limitation, or were altered or repealed by the legislature. These duties were, therefore, executed when we came into existence as a state, and being so, it was not in the power of the legislature to repeal those laws, without at the same time passing others which should substantially comply with the requirements of the constitution. It could not abrogate them entirely, and leave these plain and positive constitutional duties partially or altogether unperformed. Being once performed, no authority was given to the legislature to bring them to nought. To claim that it could do so, is to claim that the power of the agent exceeds that of the principal, and that the will of the legislature, which is a mere instrument in the hands of the people, created by them for the purpose of carrying out their wishes as expressed in, and implied from the constitution, is superior to the will of the people themselves, as declared in that instrument in obedience to which they have asserted that all power must be exercised. It is claiming that the legislature, which is subor-