Harriman and another vs. The Queen Insurance Company of London and Liverpool.

*March 12 — March 30, 1880.*

Insurance against Fire. *(1) When furnishing proofs of loss a condition of recovery. (2) Waiver of such proofs. (4) Presumption as to ownership of property. (6) When building "wholly destroyed." (10) Omission from application of facts known to agent.*
Homestead. *(5) Hotel exempt as owner's homestead.*
Pleading and Practice. *(1) What issues not triable separately. (3) Cure of erroneous refusal to nonsuit. (7) Special verdict: what errors in instructions immaterial. (8) Mode of answering questions in special verdict. (9) Court and jury.*

| | |
|---|---|
| 49 | 71 |
| 79 | 631 |
| 49 | 71 |
| 80 | 477 |
| 49 | 71 |
| 90 | 111 |
| 49 | 71 |
| 91 | 165 |
| 49 | 71 |
| 92 | 659 |
| 49 | 71 |
| 93 | 533 |
| 49 | 71 |
| 94 | 121 |
| 49 | 71 |
| 98 | 267 |
| 49 | 71 |
| 56 LRA | 785n |

1. Where a fire insurance policy provides that the loss shall not be payable until the expiration of a specified time after the proofs of loss have been

Harriman and another vs. The Queen Ins. Co. of London and Liverpool.

furnished, the furnishing of such proofs (if not waived) is a condition precedent to the right of action; and, in an action on the policy, an averment in the answer that such proofs were not furnished for the specified length of time before the action was brought, does not create an issue in abatement which must be tried before the other issues, in bar.

2. In such an action, an answer showing that plaintiff furnished what purported to be proofs of loss, and that these were not accepted as a compliance with the terms of the policy, but that "defendant at once denied that any liability to plaintiffs had arisen under said alleged policy, and refused to pay any alleged claim thereunder," *held* to show a denial of liability in any event, and an unqualified refusal to pay the loss; which was a *waiver* of such proofs.

3. Error in refusing a nonsuit is cured by the subsequent introduction of evidence completing the proof of the cause of action.

4. The answer in this case is construed as admitting that the assured had title to the property insured at the date of a deed executed by him to one C.; and it appearing that such deed did not convey such property, it must be *presumed* that the title continued in the assured until the property was burned.

5. Where a building, covering less than one-fourth of an acre, is occupied by the owner as his homestead, the fact that he keeps a *hotel* therein will not prevent its being *exempt* as a homestead, under the authority of *Phelps v. Rooney*, 9 Wis., 70.

6. Besides finding generally that the building was wholly destroyed by fire, the jury found specifically that no portion of the brick walls remaining after the fire could be used in rebuilding it; that the foundations so remaining were not sufficient to support a building of the weight and dimensions of the one burned; that the expense of removing the worthless fragments of the old building would at least equal the value of all materials left after the fire; and that such materials were worth less than the cost of getting them out of the wrecks of the building. *Held*, that these specific findings show the building to have been "wholly destroyed," within the meaning of ch. 347 of 1874.

7. Where the jury found specifically every fact necessary to sustain the judgment, errors in the instructions as to questions of law *arising upon* those facts, but having no influence upon the findings, are immaterial.

8. Where each specific question of fact was submitted to the jury in such form as to require a simple affirmative or negative answer, there was no error in instructing the jury that where, on a fair examination of all the evidence, they could not truthfully say "Yes" to a question, they ought to say "No."

9. The court may properly direct the jury to find facts established by the *uncontradicted* testimony.

10. Where the agent who issues an insurance policy knows, at the time, of outstanding incumbrances upon the property, omitted from the statements of the application, such omission will not prevent a recovery.

APPEAL from the Circuit Court for *Brown* County.

This action is upon a policy of insurance issued January 16, 1879, by the defendant company to the plaintiff *Rufus P. Harriman*, insuring him in the sum of $3,000 against loss or injury by fire to his three-story brick hotel building, situated on certain lots therein described, in the city of Green Bay.

The complaint contains a copy of the policy, by which it appears that the loss, if any, was, by indorsement thereon, made payable to the plaintiff *Mrs. Carabin*, mortgagee, as her interest might appear. The complaint alleges that the interest of *Mrs. Carabin* in the real estate upon which the insured buildings stood, amounted to $25,000; that there was $17,000 additional insurance in other companies on the hotel, to which the assent of the defendant was duly given; that, subject only to the incumbrances of his co-plaintiff, *Harriman* was the absolute owner of the hotel during the life of the policy; that the hotel was totally destroyed by fire March 8, 1879; and that due proofs of loss were made pursuant to the requirements of the policy. Full compliance by the assured with the terms, conditions and requirements of the policy is alleged generally. Judgment is demanded in favor of *Mrs. Carabin* alone for the sum written in the policy, with interest from May 25, 1879, and for costs.

The answer is very long, but the following abstract of it, copied substantially from the brief of counsel for defendant, will sufficiently show its contents:

" *First*. The answer (1) denies that the plaintiff *Harriman* was owner of the property at the date of the policy; (2) admits the execution of the policy, and pleads it as being the only contract between the parties; (3) admits partial destruction, but denies total destruction, and alleges that after the fire the foundations and much material and portions of the

walls remained, of considerable value; (4) denies that the fire was not caused in consequence of disregard by the assured of the terms and conditions of the policy, and alleges that it was caused by direct disregard thereof; (5) admits that the building was occupied by one L. H. Harriman as a hotel; (6) denies that the actual cash value of the hotel at the time of the fire was $30,000, or that the total loss suffered, estimated according to the actual cash value of the property, was $30,000, and alleges that the actual cash value and actual damage did not exceed $5,000; (7) admits the furnishing of proofs and annexes them; denies that they were accepted, and alleges that defendant at once denied liability and refused to pay; (8) denies any knowledge or any information sufficient to form a belief as to the alleged interest of the plaintiff *Carabin;* (9) denies that the plaintiff *Harriman*, at the time of the fire, or at any time during the life of the policy, was the sole or absolute owner of the property, and alleges that the title was vested in Henley W. Chapman, as thereafter stated; (10) admits the other insurance permitted, making $20,000 in all; (11) denies that plaintiffs have duly performed the conditions, and denies all other allegations not otherwise answered unto, admitted or denied.

"*Second.* For a second defense the answer alleges that *Harriman* has no interest in the subject of the action, and that it was brought without his knowledge, direction or assent, and should therefore be dismissed.

"*Third.* For a third defense it is alleged that, by the policy, the application, survey, plan or description should be considered a part of the contract and a warranty by the assured; that in case of any false representation by the assured of the condition, situation or occupancy of the property, or any omission to make known every fact material to the risk, or any overvaluation, or any misrepresentation whatever, either in a written application or otherwise, or in case the interest of the assured in the property is not truly stated in the policy,

then and in every such case the policy should be void; and that there had been a breach of all said provisions in these respects: 1. That *Harriman*, at the date of the policy, falsely represented the condition and situation of the property, and falsely represented, in reply to interrogatories, that the incumbrances did not exceed from $12,000 to $16,000, and that in no event could they exceed $16,000, and that he falsely and purposely concealed from defendant's agent a mortgage of $5,000 to Katharine G. Curtis, dated October 30, 1868, at ten per cent., upon which no principal or interest had been paid, whereas the incumbrances exceeded $20,000, exclusive of certain taxes and judgments and mechanic's liens, which were liens thereon, amounting to $11,000 and upwards. 2. That *Harriman* omitted to make known the following facts material to the risk: the existence of the Katharine G. Curtis mortgage, judgments and mechanic's liens, enumerated, amounting to $7,434.18, besides interest, and taxes amounting to $3,135.74, besides interest. 3. That his interest was other than the entire, unconditional and sole ownership, and that on March 20, 1878, he had conveyed the property to Henley W. Chapman, who, at the date of the policy, was owner thereof, and had full title thereto in fee, subject to the incumbrances of mortgages, judgments and taxes. 4. That *Harriman* overvalued the property at $20,000, when it was worth not to exceed $5,000. 5. That *Harriman's* interest in the property was not truly stated in the policy, he having conveyed it to Chapman.

"*Fourth.* For a fourth defense it is alleged, that by the policy it was agreed that if the interest of the assured was not truly stated in the policy, it should be void; that the interest of the assured was not truly stated, and was other than the entire, unconditional and sole ownership; that the property had theretofore been conveyed to Chapman; that the property was incumbered by the mortgages, judgments, mechanics' liens and taxes before set forth; that no representations in

regard to said *Harriman's* or said Chapman's ownership were made, except that the premises were incumbered from $12,000 to $15,000 by mortgages; that otherwise the interest of *Harriman* and said liens were concealed and omitted to be stated; and that none of these facts were expressed in the written portion of the policy, whereby it was void from its inception.

"*Fifth.* For a fifth defense it is alleged, that by the terms of the policy the loss was payable only after sixty days from due notice and proof of loss; that the proofs of loss were to state the actual cash value of the property, the interest of the assured, and, if that were other than entire and sole ownership, the names of the owners and their interests; that until such proofs were made the loss was not to be payable; that the proofs did not state the actual cash value, but largely over-stated it at $30,000, when it did not exceed $5,000; that they did not truly state the interest of the assured, but stated that the property belonged to *Harriman* in fee, whereas it had been conveyed to Chapman, etc. This defense claimed, there-fore, that the proofs of loss provided by the policy had never been made, that the cause of action upon the policy had not yet accrued, and that the action should be abated.

"*Sixth.* For a sixth defense the answer sets up the pro-vision of the policy that all fraud or attempt at fraud or false swearing should forfeit the policy; and it alleges fraud and false swearing in these particulars: 1. Fraud in that the fire was caused by the fraud of the insured. 2. False swearing as to the value of the property; as to its being owned by *Harri-man* in fee simple; as to the amount of the loss; and as to the cause of the fire being unknown, and its not having originated from the assured's procurement, fraud, etc."

After the jury were empanelled, defendant demanded that the issue made in the above fifth defense should be tried separately from and before the trial of the other issues made by the pleadings. The court ruled that all of the issues should

be tried together, and they were so tried.   The court directed the jury to return a special verdict in the form of answers to questions prepared by counsel for the respective parties, and refused to direct the jury to return a general verdict.   Such questions, and the answers of the jury thereto, are as follows:

"1. At the time of the execution of the assignment by *Harriman* to the receiver, Henley W. Chapman, to wit, on the 20th day of March, 1878, did the plaintiff, with his family, reside in the hotel insured?   Yes.

"2. Did the said *Harriman* and family at said time so reside in said hotel, claiming and intending it to be his home? Yes.

"3. Did the said *Harriman*, from the completion of the hotel in 1868, so reside in said hotel as his home at all times when in the city of Green Bay, until his removal to the house on Walnut street, shortly before the fire?   Yes.

"4. Did the said *Harriman* have any other home than said hotel at any time from the building of the same until up to and after the issuing of the policy of insurance in question?   No.

"5. Was there any portion of the brick walls of said building that could be used for rebuilding it after said fire?   No.

"6. Was the foundation left after said fire sufficient to support a building of the same weight and dimensions of the building burned?   No.

"7. Could a new building like the one burned have been built upon the same spot after the fire without incurring expense in getting rid of worthless fragments of the old building, at least equal to the full value of all that was left of the building burned?   No.

"8. Were the materials left after said fire of as much value for any useful purpose, as the expense would have been of getting the same out of the wreck of the building as it was left by the fire?   No.

"9. What was the cash value of said hotel building at the time of the fire?   $18,000.

"10. What was its value at the time the policy was issued? $18,000.

"11. Did the plaintiff *Harriman* authorize this suit to be commenced?   Yes.

"12. Did the plaintiff *Harriman*, at or about the time this policy was issued, make any representation whatsoëver to the agent, Benson, as to incumbrances or the amount thereof?   No.

"13. Was the agent, Benson, informed, at the time this policy was indorsed 'Payable to *Ellen Carabin*, mortgagee, as her interest may appear,' that the amount due *Mrs. Carabin* on the mortgages held by her would probably exceed $20,000? Yes.

"14. Did the plaintiff *Harriman* tell the agent, Benson, at the time the policies were made payable to *Mrs. Carabin*, that, in addition to the $12,000 or $16,000 in dispute, she had mortgages besides?   Yes.

"15. In making the representations to the agent, Benson, that he did make, did the plaintiff *Harriman* act fraudulently? No.

"16. Did the agent, Benson, make any attempt to ascertain what the various incumbrances were, after the statement made by *Harriman* to him in relation thereto?   No.   (So answered by consent.)"

The foregoing questions were drawn on behalf of the plaintiffs.   The following, except the last two, were prepared by counsel for the defendant:

"17. Did the plaintiff *Harriman* purposely and knowingly, in the proofs of loss furnished the defendant company and introduced in evidence, falsely swear that he was the owner of the insured property in fee simple?   No.

"18. Did the plaintiff *Harriman* purposely and knowingly, in the proofs of the loss furnished the defendant company and introduced in evidence, falsely swear that the insured property was of the value of $30,000?   No.

"19. Was the plaintiff *Harriman* the owner of the prop-

Harriman and another vs. The Queen Ins. Co. of London and Liverpool.

erty insured at the time the policy was issued, and from then until the time of the fire, in fee simple? Yes.

"20. Was the property insured wholly destroyed by fire? Yes.

"21. Did the plaintiff *Harriman* represent and state to the agent of the defendant, at the time he applied to said agent to make the indorsement, 'Loss, if any, payable to the mortgagee, February 1, 1879,' that the incumbrances on the insured property were from $12,000 to $16,000? Yes.

"22. What was the amount of the incumbrances upon the insured property February 1, 1879? About $20,900, being the $5,000 mortgage and interest, and balance on account of about $7,000 and interest.

"23. Did the plaintiff *Harriman* represent and state to the agent of the defendant in October, 1878, before the policy in question was issued, that the incumbrances on the insured property were $10,000? No.

"24. Did the agent of the defendant rely upon the representation made in October when he issued the policy now in question? No.

"25. Was the agent of the defendant informed at any time before the fire that the insured property was incumbered by judgment liens? No.

"26. Was the agent of the defendant informed, at any time before the fire, that the insured property was incumbered in any manner in excess of $16,000, except by taxes? Yes.

"27. Was the insured property owned and occupied by the plaintiff *Harriman*, at the time the several judgments introduced in evidence were docketed in the office of the clerk of the circuit court for Brown county, with the intention, on the part of said plaintiff, of owning and occupying the same as a homestead? Yes.

"28. By the Court: Was the insured property burned by the willful act, consent or procurement of either of the plaintiffs? No.

"29. What is the amount of the policy in question, with interest at 7 per cent. per annum, from May 25, 1879? $3,083.34."

By direction of the court, the jury also found as follows:

"1. That the interest of the plaintiff *Ellen Carabin*, at the time the insurance was effected and at the time of the fire, was $20,000.

"2. That the agent, Benson, at the time he issued the policy in this action, knew of the existence of all the tax sales and unpaid taxes mentioned in the answer herein.

"3. That said tax sales were wholly illegal and void.

"4. That the plaintiff *Mrs. Carabin* was, at the time the policy was issued, the owner of all the judgments set forth in the answer, except those in favor of Jacob Silverman, Howell Hoppock, George N. Langton and others, and Nathan Dodge.

"6. That, at the time said policy was issued, there was no judgment in favor of D. R. Rogers, nor any lien in his favor, as set forth in the answer; nor has there been any such lien or judgment since that time.

"7. That, at the time said policy was issued, the said *Harriman* was the owner of the property insured, in fee simple."

The plaintiff *Mrs. Carabin* moved for judgment on the verdict, and the defendant moved for a new trial. The court denied the latter motion, and granted the former; whereupon judgment was entered for *Mrs. Carabin* against the defendant for the amount due on the policy as found by the jury. The defendant appealed from the judgment.

Further statement of the case is contained in the opinion.

For the appellant there were briefs by *Cottrill, Cary & Hanson*, its attorneys, with *J. W. Lusk*, of counsel, and oral argument by *Mr. Cottrill* and *Mr. Lusk*.

For the respondents there were separate briefs by *Tracy & Bailey* and *Hastings & Greene*, and oral argument by *Mr. Greene* and *Mr. Tracy*.

Harriman and another vs. The Queen Ins. Co. of London and Liverpool.

LYON, J. The exceptions preserved in the record are very numerous, and the legal questions which they present are fully argued in the briefs of the respective counsel, and were elaborately and ably discussed by them in their oral arguments. All of these questions which are deemed material may be classified under a few general heads, and they will be thus stated and considered in their order.

1. At the commencement of the trial, the defendant claimed that the fifth defense, which avers failure of the assured to furnish proper proofs of loss, raised an issue in abatement, which ought to be determined before the trial of the issues made by the defenses pleaded in bar of the action. The case of *Supervisors of Brown County v. Van Stralen*, 45 Wis., 675, is relied upon as sustaining the position. The court denied the motion for a separate trial of that issue. We think the court ruled correctly. The furnishing of proofs of loss as required by the terms of the policy (unless waived), is a condition precedent to the right to maintain this action; for the policy provides, in effect, that the loss shall not be payable until the expiration of sixty days after such proofs shall have been furnished. At least, it gives the company sixty days thereafter to pay the loss. Performance of this condition precedent is, and necessarily must be, alleged by the plaintiffs, and, unless admitted or waived, must have been proved by them on the trial, or they were not entitled to recover. *Redman v. Ins. Co.*, 47 Wis., 89. This is so because such performance is a constituent and indispensable part of the right of action. On the averment of performance of that condition an issue is made by a general or specific denial, and there is no necessity whatever for a formal plea in abatement or a separate trial of the issue.

If an action on an insurance policy fails for want of proofs of loss, the judgment may be either in bar or abatement, according to the terms of the contract. If the time for making such proofs has expired, and the contract is that the insurer

shall be discharged from liability unless the proofs are furnished within the specified time, the judgment will be a bar to another action on the same policy. But if time remains in which to make the proofs, the judgment will be that the action abate because prematurely brought.

In this case, however, there is no issue concerning the furnishing of proofs of loss. It is expressly stated in the answer that the plaintiff *Harriman* furnished to the defendant what purported to be such proofs; that the same were not accepted as a compliance with the terms of the policy in that behalf, but (quoting from the answer) " on the contrary this defendant at once denied that any liability to the plaintiffs, or either of them, had arisen under said alleged policy, and refused to pay any alleged claim thereunder." This is an express waiver of such proofs; for it is a denial of liability in any event, and an unqualified refusal to pay the loss. Such denial and refusal rendered the presentation of proofs of loss an idle formality, which the law does not require. *McBride v. Ins. Co.*, 30 Wis., 562.

2. When the plaintiffs rested the case on their part, they had given no evidence tending to show that *Harriman* was the owner of the insured property, or that *Mrs. Carabin* had any interest therein as mortgagee. Counsel for the defendant thereupon moved for a nonsuit because no such evidence had been given. The court denied the motion.

*First*. No direct proof of *Harriman's* title to the insured property was made on the trial. Counsel for plaintiffs contend, and have cited authorities in support of the position, that, having insured it as his property, the burden was upon the defendant to show his want of title. For reasons which will presently appear, we do not find it necessary to determine the question. We think the fair and reasonable construction of the answer is, that it admits that title to the insured property was in *Harriman* down to the time of the alleged conveyance thereof by him to Henley W. Chapman, in March,

1878. It substantially alleges that Chapman became the owner thereof by means of such conveyance, which could not be true unless *Harriman* was the owner when the conveyance was executed, and all of the denials of *Harriman's* title seem to be predicated upon the fact that he had executed such conveyance. Hence, if Chapman took no title to the insured property by the conveyance in question, it must be presumed, nothing appearing to the contrary, that the title remained in *Harriman* until the property was burned.

The conveyance to Chapman was put in evidence on behalf of the defendant. It is a conveyance by *Harriman*, in general terms, of "all his interest in and title to any real estate, wherever situate, *not exempt from execution*," and contains no specific description of property affected by it. It appears, from recitals therein, that the same was executed compulsorily, pursuant to an order made by a court commissioner, in proceedings against *Harriman* supplementary to execution, in which proceedings Chapman had been appointed receiver.

The jury found that the insured property was *Harriman's* homestead, and therefore exempt from execution. If that finding (which will be hereafter considered) is upheld, it follows necessarily that the answer admits title in *Harriman*, and the plaintiffs were not required to make affirmative proof of the fact. It is immaterial that the conveyance to Chapman was put in evidence on behalf of the defendant after the motion for a nonsuit had been denied. It is well settled that if a motion for a nonsuit for want of evidence to sustain the action be improperly denied, the judgment for the plaintiff will not be reversed for that reason if the necessary evidence be supplied afterwards.

*Second.* The last remark disposes of the objection that when the nonsuit was denied no proof had been made that *Mrs. Carabin* had any interest in the insured property. Such proof was made during the progress of the trial.

We conclude, therefore, that if the insured property was the

homestead of *Harriman* when he executed the conveyance to Chapman, the refusal to grant the nonsuit will not work a reversal of the judgment, the error (if it was error) having been subsequently cured.

3. All the facts ordinarily required to be proved to establish the existence of a homestead right were found by the jury. The jury found that when the conveyance to Chapman was made, *Harriman* resided, with his family, in the hotel, claiming and intending it as his home; that he so resided therein from its completion in 1868 until after the policy in suit was issued, and had during that time no other home; and that he owned and occupied the same, claiming it as his homestead, when the several judgments introduced in evidence were docketed.

These findings are supported by the evidence, and manifestly they demonstrate that the property was *Harriman's* homestead, unless the fact that it was also built for and used as a hotel deprives it of its homestead character, and its owner of any homestead rights therein. The undisputed evidence proves that the hotel was a large building, but covering less than one-fourth of an acre, including a court between two wings of unequal length extending from the main building, at the two ends thereof, to the rear; and that from the time it was erected until burned it was always kept as a hotel, a portion of the time by *Harriman* and the remainder of the time by his lessees.

We regard the case of *Phelps v. Rooney*, 9 Wis., 70, as decisive of the question under consideration. In that case, a building 20 feet wide, 150 feet deep, and four stories high — the basement and next story above it and part of another story being occupied as a store, the annual rent of which was valued at $1,500, and the remainder of the building being occupied by the owner as a residence — was held to be a homestead. The building was one of a continuous block of stores between East Water street and the river, in the city of Milwaukee.

The then chief justice of this court dissented vigorously from the judgment, but it has never been overruled or shaken, and it is now too late to disturb it by judicial decision.

It may be that it would have been better had the court adopted the rule of later cases, where questions of the taxability of certain property of railroad companies have arisen, and held that property is not a homestead unless it is used principally as the residence of the owner; that if the chief use to which it is applied is for some other purpose — as a manufactory, store or hotel,— it is not a homestead, although it may also be used incidentally as the residence of the owner. *Railway Co. v. Sup'rs of Crawford Co.*, 29 Wis., 116; *Same v. Same*, 48 Wis., 666; *Railway Co. v. Milwaukee*, 34 Wis., 271. But the rule in *Phelps v. Rooney* has stood too long to be now questioned here. The subject has passed from the courts to the domain of legislation.

It must be held, therefore, that under the findings of the jury the insured property was the homestead of *Harriman* from a time prior to the conveyance to Chapman until after the policy in suit was issued. From this it necessarily results that the property was not conveyed by *Harriman* to Chapman, and that the judgments against *Harriman* (none of them being specific liens) were not liens upon such homestead.

4. The next question which will be considered is, Was the building wholly destroyed, within the meaning of chapter 347, Laws of 1874? In addition to finding generally that the insured building was wholly destroyed by fire, the jury found that no portion of the brick walls of the building remaining after the fire could be used in rebuilding it; that the foundations so remaining were not sufficient to support a building of the weight and dimensions of the one burned; that the expense of removing the worthless fragments of the old building would at least equal the value of all material left after the fire; and that such materials were worth less than.

the cost of getting them out of the wreck of the burned building.

These specific findings are supported by the evidence. Without attempting to define what constitutes a total destruction of a building, or to lay down a rule applicable to other cases, we cannot hesitate to hold that these findings show that the building in question was wholly destroyed, within the meaning of that term as used in the statute above cited. Hence, the findings as to the value of the building cannot reduce the recovery.

5. The instructions which the court gave the jury, many portions of which were excepted to on behalf of the defendant, will now be considered.

*First*. Many of these exceptions cover portions of the charge containing statements of the law applicable to the case generally, or to particular questions involved in it. These instructions were of no significance whatever in determining the specific questions of fact submitted to the jury. This observation applies to those portions of the charge in which the court explained to the jury what constituted a homestead, and what was a total destruction of a building, within the meaning of the act of 1874. It applies, also, to certain instructions proposed by counsel for defendant as to the effect of false representations made by the assured when he applied for the insurance. The law of the case was for the court to apply, in rendering judgment on the special findings, and the jury had no concern with it. They were only required to find the facts. True, they found that the building was wholly destroyed, which is, perhaps, a mixed finding of law and fact; but that might have been omitted without affecting the result, for they also found, specifically, all of the facts necessary to show that the building was wholly destroyed. No further notice need be taken of exceptions of this class.

*Second*. A paragraph in the charge reads as follows: "The only thing that you ought to concern yourselves about is,

What is the truth of this case? and when you determine what the truth is, put it down, whether it strikes your nearest friend or most bitter enemy. Again, in answering these questions, where you cannot say truthfully, on a fair examination of all the evidence, 'Yes' to a question, you ought to say 'No;' because a question sometimes may be put so that an answer 'Yes' will not convey the exact truth; and, if you should put down 'Yes,' when that in your judgment was not the exact truth, it would be wrong, and therefore your proper answer to that question should be 'No.' Bear that in mind, and it will help you a great deal. in arriving at the proper answer to be put down to each one of these questions."

A general exception was taken to the whole paragraph. The first sentence is faultless, and probably this fact of itself is fatal to the exception. But, however that may be, we find no error in the instruction. All of the specific questions of fact submitted to the jury (except those calling for values) were so framed as to require categorical answers. Each question could only be answered by a simple "Yes" or "No." As we understand the instruction, the jury were told, in substance, that if they were unable upon the evidence to give an affirmative answer to a given question, they should answer it in the negative. Perhaps, had the instruction been prepared by the learned circuit judge at his leisure, and not in the haste and confusion of a sharply contested trial, he might have expressed the idea he intended to convey a little more felicitously; yet we see no reason to believe that any one could have misunderstood his meaning.

*Third.* As to the facts which the court directed the jury to find, we think they are established by the uncontradicted testimony, and hence the direction was proper.

The testimony of *Mrs. Carabin* and her agent, Morrow, which is not disputed, shows that she owned or held as collateral security all mortgages and mechanics' lien judgments proved on the trial to be liens on the insured property; that

one of these mortgages, referred to as the Katharine G. Curtis mortgage, amounted to a little more than $10,000; and that all the residue of such liens, on the first of January, 1874, amounted to $6,978.17, which, with interest at 10 per cent. added, made the amount due when the policy was issued, $10,525. The jury subsequently found the aggregate of these liens to be $20,900. Morrow also testified that April 1, 1874, *Harriman* owed him $11,570, an increase in three months of about $4,600, and that they treated the same as a lien upon the property. The circuit court held, and we think correctly, that, the incumbrances on the property being less than $7,000 January 1, 1874, that sum and time were to be taken as the basis of the computation, and that the amount could not be increased by a subsequent parol agreement between Morrow (who owned or controlled the incumbrances) and *Harriman;* and especially so because the property was a homestead, and *Harriman* had a wife living, without whose consent, evidenced by her signature, he could not incumber it.

The testimony of Mr. Benson, the agent of the defendant, who issued the policy in suit, is that when he issued it he knew that the unpaid taxes on the insured property were outstanding. Indeed, he had been city treasurer for three years, and was defendant in actions brought to set these taxes aside as illegal. Under these circumstances it is quite immaterial whether such unpaid taxes were valid or not.

The question of *Harriman's* title has already been considered. Further discussion of the instructions would be profitless. It must suffice to say that we find no error in them which will justify a reversal of the judgment.

6. Some of the special findings have already been discussed under the foregoing heads. It is only necessary to add that there is evidence tending to prove all of the facts found by the jury, and hence none of the findings can be disturbed. We think that the findings cover all of the material issues

made by the pleadings, upon which there was any conflict of testimony, and that such findings are of themselves sufficient to support the judgment.

7. Many points and exceptions not herein specially stated are discussed in the briefs of counsel. Some of these are rendered immaterial by the views above expressed; and it is believed that those which are material are disposed of adversely to the defendant by our rulings upon the different questions hereinbefore considered and passed upon.

It is quite unnecessary, and the length to which this opinion has been extended renders it improper, to discuss those points and exceptions further, or even to state them.

*By the Court.* — The judgment of the circuit court is affirmed.